(March 2, 1885.)

## SYNNOTT v. SHAUGHNESSY.

[7 Pac. 82.]

SALE—AGENCY—FIXED PRICE.—If A and B own a mine and authorize C to sell it for them, or bring them a purchaser at a fixed price, with the understanding that C is to have all he can get above that price, C may make the best bargain he can with anyone; he may purchase it himself, and is under no obligation to disclose to A and B anything he may have discovered concerning the mine after such arrangement is made.

(Above syllabus by the court.)

AGENCY—COMMISSION FROM BOTH PARTIES.—If an agent act openly and with the consent of both owners and purchaser, he may contract for and receive a commission from both.

APPEAL from District Court, Alturas County.    Affirmed.

Angel & Sullivan and John R. McBride, for Appellants.

It is not sufficient to find upon a probative fact, from which it might be argued that the court below was of a certain opinion as respects one of the ultimate facts. (*Pacific Bridge Co. v. Kirkman,* 54 Cal. 558; *Kahn v. Smelting Co.,* 102 U. S. 641; *Biddell v. Briggs,* 56 Cal. 374; *French v. Edwards,* 21 Wall. 147; *Crews v. Brewer,* 19 Wall. 70; *Marsters v. Lusk,* 61 Cal. 146; *Lang v. Specht,* 62 Cal. 146; *Dunn v. Dunn,* 62 Cal. 176; Hayne on New Trial and Appeal, 727, 732.) "Whenever the interposition of a middleman or go-between is used to effect a contract there brokerage exists." (Wharton on Agency, sec. 697; Story on Agency, secs. 28, 31, 109.)    Brokerage is agency. (Wharton on Agency, *supra;* Story on Agency, *supra; Brown v. Pforr,* 38 Cal. 550; Paley on Agency, 13; Bouvier's Law Dictionary, tit. "Broker"; Burrill's Law Dictionary, tit. "Broker"; Paley on Agency, by Lloyd, p. 171, note.    "An appropriation of the fruits after wrongful act of an agent is a ratification of such act, and makes the party liable to the same extent as if his acts had been expressly authorized." (*Murray v. Beninger,* 3 Keyes, 107; Cro. Eliz. 827; *Craig v. Ward,* 3 Keyes, 387; *Waterman v. Dalley,* 51 N. Y. 341; *Garner v. Mangam,* 93 N. Y. 643; *Lee v. Sandy Hill,* 40 N. Y. 488; Kerr on Fraud and Mistake, 111, 112, 137; 1 Parsons on Contracts, 73; Story on Agency, secs. 308, 452, 456; *Krumm v. Beach,* 96 N. Y. 404, 405.)    "When a purchaser enters into any side contract or arrangement with the agent or broker of the seller, unknown to the latter, by which they mutually or either of them procure a benefit to themselves, such an arrangement *per se* renders the sale fraudulent and avoids it at the option of the seller." (Wharton on Agency, secs. 244, 245; Story on Agency, 5th ed., sec. 211, and note 2; *Ballam v. Loomis,* 3 Cent. L. J. 263; Bigelow on Fraud, 227, 228, 229; *Moore v. Mandelbaum,* 8 Mich. 433.) Any unfairness, any underhanded dealing, any use of knowledge not communicated to the principal by an agent, any lack of perfect good faith which equity requires, renders the transaction voidable, so that it will be set aside at the option of the principal." (Bigelow on Fraud, *supra;* Pomeroy's Equity Jurispru-

dence, sec. 954, p. 486; *Michaud v. Girod,* 4 How. (U. S.) 503; *Norris & Foltz v. Taylor,* 49 Ill. 17, 95 Am. Dec. 568; *Marye v. Strause,* 2 Morr. Min. Rep. 244; Kerr on Fraud and Mistake, 175, 176, 195.)

Rosborough & Merritt, for Respondent.

The omission of the court to make findings upon immaterial matters was not error. (*Lucas v. San Francisco,* 28 Cal. 591; *Miller v. Steen,* 30 Cal. 402, 89 Am. Dec. 124, and note; *Caldwell v. Brooks,* 28 Cal. 151.) A finding of fact by the lower court will not be disturbed by the appellate court, when the evidence was conflicting, or where the conclusion drawn from it is not necessarily erroneous in point of law. (*Lewis v. Coviland,* 21 Cal. 178.) An appellate court will not set aside the findings and grant a new trial on the ground that the findings are not warranted by the evidence, unless the evidence was such that if the questions were submitted to a jury, the court would set aside the verdict as contrary to evidence. (*Moore v. Murdock,* 26 Cal. 514.) To set aside a contract on the ground of misrepresentation, it must be something material, constituting some motive to the contract, something in regard to which reliance is placed by one party in the other, and by which he is actually misled, not a matter of opinion merely, equally open to the examination of both parties. (*Smith v. Richards,* 13 Pet. 29; *Harris v. Tyson,* 24 Pa. St. 347, 64 Am. Dec. 661.)

MORGAN, C. J.—The cause was tried before the court at the June term, 1883, of the district court for Alturas county. Judgment was for the defendant and the complaint dismissed. Plaintiffs moved for a new trial, and the motion was denied. Plaintiffs appeal both from the judgment and from the order denying a new trial.

The case shows that on the fifth day of July, 1881, the plaintiffs were the owners and in the possession of the Eureka mine, situated in Mineral Hill mining district, in Alturas county, in the territory of Idaho. On the said fifth day of July, 1881, the said defendant, by his agent, E. A. Wall, purchased the said mine from the plaintiffs John Synnott and Peter Welch for the sum of $2,200; that on the same day plaintiffs executed and de-

livered to the defendant a good and sufficient deed of convey-
ance.   On the twenty-fourth day of May, 1882, the plaintiffs
bring this action and ask the court to declare this deed fraudu-
lent, null, and void, and set it aside and put the plaintiffs again
in possession of said property.   Plaintiffs aver: 1. That on
the third day of July, defendant, by his agents and employées,
discovered on said Eureka claim a large and valuable vein or
body of ore, from eighteen inches to four feet in thickness, ex-
tending about seventy feet continuously along said vein, which
rendered said claim of great value, to wit, of the value of $100,-
000.   Defendant denies.   2. Plaintiffs aver that defendant, by
his agents, fraudulently and falsely concealed the said vein
or ore body from the plaintiffs.   Defendant denies.   3. Plain-
tiffs aver that defendant, by his agents and servants, falsely
and fraudulently represented and stated to these plaintiffs that
no other ore body, or vein of ore, existed in said mining claim,
except such as were found by and known to these plaintiffs, as
shown in their own tunnels as aforesaid, when defendant well
knew, etc., that said vein did exist.   Defendant denies.   4.
Plaintiffs aver that said false and fraudulent representations
were made by defendant's agents and servants to plaintiffs, to
induce them to sell said mining claim at far below its real
value, to wit, for the sum of $2,200; and that said false and
fraudulent representations, so made by the agents and servants
of defendant, did induce plaintiffs to believe that no such ore
body existed, and that said mining claim was not worth more
than $2,200, and that said plaintiffs were thus induced to sell
and convey said claim for said last-mentioned sum, when, in
fact, said claim was then worth $100,000.   Defendant denies.
5. That immediately prior to the discovery of said ore vein or
ore body the said plaintiffs had employed one Harry Porter as
agent to find them a purchaser for said mining claim, at the
price of $2,500, and that, relying upon the honesty of said agent,
they agreed to give said Porter ten per cent of said purchase
price as a compensation.   Defendant denies.   6. That while so
employed the said Porter first made the discovery of said vein
and ore body aforesaid, which was unknown to plaintiffs.   De-
fendant denies.   7. That said Porter concealed the same from
plaintiffs, and surreptitiously, fraudulently, and collusively, and

for the consideration of $1,000, informed the said defendant of the existence of said large vein or ore body, and undertook and agreed to conceal the same from plaintiffs, and to assist said defendant in the purchase of said Eureka claim at $2,000 or a price greatly below its real value; that by such fraudulent acts of said Porter, as well as the misrepresentations and concealments, they were induced, etc. Defendant denies. These are all the material issues raised by the pleadings. Upon substantial affirmative proof of all the material averments of fraud on the part of either Wall, the agent of defendant, or on the part of Porter, alleged to be their own agent, plaintiffs claim the right to recover. If they have failed in both, the case fails. The principal errors assigned are: 1. That the court has failed to find on all the material issues; 2. That the findings are not supported by the evidence; 3. That the findings do not support the judgment.

The first two propositions are so interwoven and intimately connected that they will be discussed together. The first material issue is, Did the defendant, by his agents and servants, on or about the third day of July, 1881, or before the sale, find a large and valuable vein or body of ore, from eighteen inches to four feet in thickness, extending about seventy feet continuously along said vein, which rendered the mine of great value? In reply to this, the court, in its finding of fact No. 12, say: "The evidence does not show or tend to show that Wall or Porter, or any other person, had discovered or knew of the existence of any vein or lode of ore in place on the Eureka mining claim, other than such as had been found by and was known to Synnott and Welch (the vendors) in their excavations at any time prior to the sale and execution of the deed." Objection is made to the use of the words, "the evidence does not show or tend to show." The fact that they had discovered the vein or lode of ore in question before the sale must be proven by the evidence. If the evidence does not show it, nor tend to show it, then, so far as the purposes of the trial go, they had not discovered it, nor did they know of its existence. No one would fail to understand fully the meaning of the court, which was that neither Wall nor Porter, nor any other person, knew of the existence of the vein or body of ore described. We think the

finding substantially met the issue presented.  The statement of a fact in language such that men of ordinary knowledge, as well as those learned in law, would understand from it that the fact did or did not exist, would seem to be sufficient.  The statement is such that it leads us to the inevitable conclusion that the fact alleged did not exist.  (See *People v. Hagar,* 52 Cal. 189; *Coveny v. Hale,* 49 Cal. 552; *Emmal v. Webb,* 36 Cal. 204.)  The fact itself, however, is positively stated in the last half of the fifteenth finding, which is as follows: "Neither the defendant nor any agent of his had ever discovered or knew of the existence of any vein or lode in said claim (except such as Synnott and Welch had exposed by their tunnels) prior to the sale, nor until some days had elapsed after the sale."  This is a statement of fact, pure and simple, and completely meets the issue tendered.  Objection is made to the use of the terms "vein or lode of ore in place" and "vein or lode."  The words "vein," "lode," and "ledge" are used as synonymous terms, in the common parlance of miners, in the laws of Congress, and in the decisions of courts in mining states and territories.  Section 2320 of the Revised Laws of the United States uses the terms as follows: "Veins or lodes of quartz, or other rock, in place, bearing gold, silver," etc.  Section 2322: "Locations made on any vein, lode, or ledge situated on the public domain," etc.  Section 2323: "Where a tunnel is run for the development of a vein or lode."

Mr. Justice Miller, of the United States circuit court for the district of Colorado, and Justice Hallett, sitting with him, in the case of *Stevens v. Williams,* 1 McCrary, 480, Fed. Cas. No. 13,413, 1 Morr. Min. Rep. 566, 573, clearly define what a vein, lode, or ledge is, as follows: "In general, it may be said a lode or vein is a body of mineral, or mineral body of rock, within defined boundaries in the general mass of the mountains; nor does the fact that it is occasionally found in the general course of this vein or shoot, in pockets deeper down into the earth, or higher up, affect its character as a vein, lode, or ledge."  This is a perfect definition of the terms "vein," "lode," and "ledge," as understood in mining countries, and also demonstrates the fact that the terms are synonymous. That the terms "vein" or "ore body," as used in the complaint,

mean, and were intended by the pleader to mean, the same as if the words "vein or lode of ore," in place of the words "vein or lode," had been used, is abundantly indicated by the words which follow in the complaint, namely, that the defendant, etc., by his agents and employees, had on third day of July, 1881, discovered on said Eureka mining claim, remote from where these plaintiffs had been at work, a large and valuable vein or body of ore, from eighteen inches to four feet in thickness, extending for about seventy feet continuously along said vein.

The context clearly indicates that the pleader intended to allege that defendant had so discovered a vein or lode of ore in place, and did not mean by that pieces of float ore, however large or small they may have been, which had broken loose and become detached from the mother lode, and floated down the hill, which is commonly, indeed, universally, called "float" in the mining regions.

The meaning of the terms as used is further indicated by the allegation which follows, to wit, the existence of which rendered said mine of great value, to wit, of the sum of $100,000 and upward, of the existence of which said vein or body of ore these plaintiffs were wholly ignorant. The pleader well knew that the discovery of float ore did not render the mine of such great value. The experience of men in mining regions teaches them that the discovery of "float" may lead to the ultimate discovery of a vein or lode of ore in place, which would render the mine valuable. They have also learned by sore experience, and after the expenditure of large sums of money, that it frequently leads to the discovery of nothing of any value.

Further evidence that the pleader considered the words "vein or body of ore" synonymous, and, as used, were intended to mean the same thing, is found in the second clause of the complaint, where the terms are used interchangeably, as they allege that defendant represented that no other ore body or vein of ore existed, and further on in same clause that no such body or vein of ore existed. Further on the pleader again returns to "vein or body of ore," clearly showing that the pleader himself considered the terms synonymous. These findings of fact are, we think, entirely responsive to the issue, and completely evidence?

negative the allegation.  Are these findings supported by the

Porter testifies that on Sunday before the fourth day of July, 1881, he was on the Eureka claim, and was going up the hill on the trail, and picked up a small piece of float, about half as big as a hen's egg, and found three or four more very small pieces.  "I made no further search until the 5th of July (which was the day of the sale to Wall).  I went up with John Gilman. Did not then find any solid vein where it came from.  I followed it up (that is, the float) and found one piece for Colonel Wall about six inches through and eight inches long, about fifty feet from the trail.  I did not think it made the claim more valuable to any large extent.  If I had, I should have bought it myself, as I was in condition so I could have bought it.  That was all the workings, and what was found outside, altogether.  There was no concealment of this float at all; it laid right there.  I showed that float to John Gilman the same afternoon.  I was trying to get him to buy it."  This was all the ore found by Wall or Porter, outside the tunnels of the owners, prior to the sale.  He says that piece, six by eight, was the largest piece that was found.  "It was in open ground, nearly bare, and was in plain sight.  These two places where I found this float were about seventy-five feet from the cabin of Synnott and Welch.  I think I saw Mr. Welch walking over the same ground where the ore was before the sale."

Colonel Wall testifies: "The only evidence of a vein that I saw at any time previous to the purchase was small fragments of broken ore which may have come from that vein or from any source, nor was there any ore that I saw at any point on the claim that was visible to any person, in place, in the vein or near the vein.  In fact, there was no ore discovered in place in the vein at all until after several days' work had been done with a number of men; merely fragments of ore that had been detached from the lode and drifted down the hill.  This work was all done after the purchase."

John Gilman swears he saw a few pieces of weather-beaten float; that Porter was with him; picked up a piece and showed him.  "There had been no work done there; saw no excavation whatever; saw no vein at all."

This is substantially all the testimony there is as to defendant, his agent, Wall, or Porter, knowing anything about ore being found before the sale.   It is evident it falls far short of sustaining the allegations as to discovering a vein or body of ore, and abundantly supports the findings twelve and fifteen above quoted.

The second material averment is 'that defendant, by his agents and servants, fraudulently and falsely concealed the said vein or ore body from the plaintiffs.   In response to this issue the court finds: "No. 15. No concealment of any material fact concerning said mining claim was ever made by the defendant or by any agent or employee of his.   Neither the defendant nor any agent of his had ever discovered or knew of the existence of any vein or lode in said claim (except such as Synnott and Welch had exposed by their tunnels) prior to the sale, nor until some days had elapsed after the sale."   This finding is completely responsive to the issue made by the allegation, and is supported by the evidence as already demonstrated, as it needs no argument to show that the defendant or his agents could not conceal a vein or ore body which they had not discovered, and of the existence of which they had no knowledge.

The third averment is that defendant, by his agents and servants, falsely and fraudulently represented to plaintiffs that no other ore body or vein of ore existed in said mining claim, except, etc., when defendant well knew it did so exist.   In response the court say: "Finding 14. No false or fraudulent representation concerning the Eureka mining claim was ever made to said vendors, or to anyone else, by the defendant, or by any agent or employee of his."   This finding being in response to the averment which assumed that defendant had discovered and knew of the existence of the said vein, which assumption not being supported by the evidence, it follows that this finding is so supported.

The first, second, and third averments having been found against the plaintiffs, the fourth averment is no longer an issue; but it is responded to in the seventeenth finding, which states that Synnott and Welch were not induced to rely upon, and did not rely upon any representation, opinion, or act of the defendant, or of any agent of defendant, concerning said mining claim,

in selling or disposing of the same, or estimating its value or price.

The fifth averment is that, immediately prior to the discovery of said vein or ore body, plaintiffs had employed one Harry Porter as agent to find them a purchaser for $2,500; that they would give him ten per cent of that sum as compensation; that he then discovered the ore body; that he agreed to conceal it for $1,000 from plaintiffs, and did conceal it from them, but showed it to defendant's agent, Wall, and agreed to assist Wall in purchasing the mine for a price greatly below its real value. The court below having found that no such ore body was ever discovered by Porter, Wall, or anyone else, before the sale, and the evidence conclusively showing that such finding was correct, the whole question of discovery, fraudulent concealment, fraudulent representations concerning it, is finally disposed of. It remains to inquire whether Porter's receiving the $1,000 from Wall, the agent of defendant, in any way affected the validity of the sale.

The character of the arrangement between Porter and the plaintiffs is thus stated by Synnott and Porter in their testimony. Synnott states that he first told Porter that if he would find a purchaser at $2,500, they would give him ten per cent of the sum. Porter said he was trying to sell the Homestake. When he got through with that he would try to find a purchaser for the Eureka. This was about the 25th of June, 1881. He then comes down to the fifth day of July, 1881, the day on which the sale was made, and narrates the sale and conveyance, as follows: "Wall [agent of defendant] came to us on the fifth day of July and offered us $2,000 for the mine. After some consideration we agreed to take it, and it was arranged we should go to Bullion after supper and make the deed. Then Gilman came to us and offered us $1,800 and one-tenth of the mine, or $2,200 cash. Gilman then told us Porter had made a big find on the Eureka. I said, 'Where?' Gilman said, 'You walk over it'; pointing up the trail. I said I knew better; I did not believe it. In the evening, after supper, we went down to Wall's office. Porter told Wall that Gilman had again been to see them, and offered them $200 more, and they said they could not

afford to lose it.  Wall then agreed to give us $2,200.  We took it and made the deed."

Synnott then returns to the arrangement with Porter, and says: "It may have been in June we had tried to sell it.  The least we ever offered to sell the mine for was $2,000.  Whether that was in May or June I don't know."  "Q.  When and how long was Porter in your employ?  A.  As I have stated, it was about the 25th of June; it may have been a few days after that that we spoke to Porter; that would be perhaps ten or twelve days until the sale was consummated.  Q.  Was he in your employ until the sale was made?  A.  We considered so.  The sale was made on the 5th of July.  Q.  Do you say that he continued in your employment that long?  A.  I have stated how we employed Porter, and you will have to infer from that. We promised to give Porter ten per cent on $2,500, and Mr. Porter told us he could not get but $1,800.  We told him the least we could take was $2,000, and we could not afford to pay him anything out of that.  That was the understanding between us until the time of the sale.  He was to get nothing out of $2,000.  We could not afford to pay him anything.  There was no other arrangement.  The next thing we knew was, Porter brought Colonel Wall on the ground on the 5th.  We did not consider we owed Porter anything out of the $2,200. Never offered him anything, as we got the extra $200 through Gilman.  Q.  How do you make that out?  Who caused you to make the sale?  A.  I suppose Porter; he made the sale, and we supposed he got the money from Colonel Wall.  Q.  All that Porter did you considered a gratuity, for which he was entitled to no pay?  A.  He was entitled to no pay from us."

Porter, in his testimony, states: "Synnott and Welch gave me a sort of verbal bond if I should sell the property at such a figure they would give me a certain amount.  The arrangement was that they should give me all over $2,000 that I could get for the ground.  That was in June, 1881; I think about the middle of June.  I was to have whatever I could get over $2,000.  I was acquainted with the mine and its workings, and the showing as to ore.  I made efforts to sell the mine under this arrangement.  Made a sale to Colonel Wall, the agent for Shaughnessy. The deed was made to Shaughnessy, I believe.  Colonel Wall

went to them about it, and bought it from them; made the trade with them. I went and got Colonel Wall to look at the property. I brought the parties together. I had stated the terms upon which the mine could be bought to Colonel Wall. I took Wall to see the property, and told him if he bought the property from them I wanted him to respect my option. He agreed to do it, and agreed to give me $1,000 for my option, or one-fourth of the mine. Q. State, now, particularly, what was the agreement upon your part and upon the others in regard to that option or verbal bond. A. I was to have all I could get over $2,000. They wanted to get $2,000 for the ground. They did not want me to sell the mine at $2,000 and then give me any ten per cent. They wanted $2,000, and if they could get that, they were satisfied, and I could have all over. There was no agreement between us that I should have a fixed per cent on a fixed price."

This was all the testimony on the matter of the arrangement between Porter and the plaintiffs. This testimony indicates that there may have been, at one time, an arrangement that Porter was to find a purchaser at $2,500, and Porter to have ten per cent thereof, although Porter swears positively that there was not. The evidence was conflicting, and the court below finds that there was such an arrangement, and that afterward said arrangement was changed to what was termed a verbal option that Porter was to get the plaintiffs $2,000, and he to have all he could get over that sum. The precise time at which the first and last of these two arrangements were made is not stated by either Porter or Synnott. Porter testifies that the latter arrangement was made about the 26th of June, and was not changed afterward. Synnott testifies that it might have been May or June. All the talk about this matter occurred before Wall went to look at the mine, and before he had any conference with Porter, as appeared by the evidence. Porter brought the parties, Wall and plaintiffs, together, and they made their own contract; Porter simply having before stated to Wall that their price was $2,000, and the parties made their own trade. The fact that Wall finally paid them $200 more than they had agreed to take does not change the relation between Porter and plaintiffs.

It is laid down as the law that if an agent act openly, and with the consent of both owner and purchaser, he may contract for and receive a commission from both. (*Finerty v. Fritz,* 1 Morr. Min. Rep. 439, and cases cited.) And again, if the extent of the agency be merely to bring the parties together, and does not involve the duty of negotiating for either, the agent is termed a "middleman," and may contract for and receive commissions from both. (*Finerty v. Fritz,* 1 Morr. Min. Rep. 440; *Stewart v. Mather,* 32 Wis. 344; *Shepherd v. Hedden,* 29 N. J. L. 334; *Herman v. Martineau,* 1 Wis. 151, 60 Am. Dec. 368.) This is true also if each have agreed to pay the agent a commission, with or without the other's consent, if his duty is simply to bring the parties together. (Whart. Com. Law Ag., sec. 337; *Rupp v. Sampson,* 16 Gray, 398, 77 Am. Dec. 416; *In re Owens,* 7 Ir. R. Eq. 235; affirmed, 7 Ir. R. Eq. 424.)

It is evident from the testimony of Wall, Porter, and Synnott, all the parties who had anything to do with the sale and conveyance of the mine on the 5th of July, that the trade was made under the last arrangement, as Synnott states that he "did not consider that Porter was to have anything from us; we expected he would get his pay from Wall. We never paid him anything; never offered him anything. Porter never demanded anything from plaintiffs. Wall promised to respect Porter's option. He did so, and paid him the $1,000 agreed upon." If this arrangement had been reduced to writing, no one would question for a moment the perfect propriety of the arrangement. It would then have been a bond to sell and convey at a fixed price on the part of plaintiffs, and on the part of Porter it would have been an option to purchase at a fixed price. It was precisely what Porter termed it—a verbal option or verbal bond—and, when in writing, a very common method of undertaking to find a purchaser for a mine, or to buy one. Would this option be less proper or less binding upon the parties if verbal instead of in writing? Clearly not. The only danger in such case would be the liability of the vendor to demand more, and the liability of the purchaser to refuse to respect the option, the former of which occurred in this case. What was the obligation of Porter? It was evidently understood by plaintiffs that Porter would get his pay from Wall. He was at per-

fect liberty to get all he could above $2,000. He could, with perfect propriety, become the purchaser himself.

This whole subject is discussed clearly and at length in case above cited (*Finerty v. Fritz*). In that case the bond was in writing. The court say: "The bond in question was one of those ordinary titled bonds so extensively employed in the mining regions of this state [Colorado], by means of which those desiring to speculate in mines before purchasing the same outright, procure from the owners an option to buy, on payment of a stipulated price within a fixed period of time; the obligor binds himself to execute a deed to the obligee on performance of the condition. No obligation is executed by the obligee. If the contract proves advantageous to the obligee, he pays the purchase money and receives a deed, otherwise he suffers the time for performance to lapse. . . . . The obligee may contract a sale of the property on his own account, and at any price he can obtain." In this case Porter might have purchased the mine openly from Synnott and Welch for himself. The evidence clearly shows that Synnott and Welch fixed the price upon their own knowledge of the mine. They had worked upon it over a year; had run four tunnels in different places where they thought the showing good. They had opportunity to know, and believed they did know, more about the mine than any other person. They had been trying to sell it to different persons for some months, and had failed. The highest offer ever made them was that of Gilman, which was $2,200, and that was the day of the sale. The same amount was given them by Wall. It is just as apparent that Wall bought on his own judgment. He might have failed to find a vein, as plaintiffs had done. It is reasonable to suppose that Synnott and Welch had seen the same float themselves (except the larger piece), and did not regard it as indicating that the mine was of any more value on account of it. They manifested no interest in it when informed by Gilman. Synnott said he knew better. When Porter accepted the proposition of plaintiffs to sell for $2,000, with the expressed understanding that he was to have all he could get over that sum, he was then under no obligation to reveal anything he discovered to the plaintiffs. The equities in the case do not seem to be clearly with the plaintiffs, as the

learned counsel contend. The plaintiffs sold the mine for $2,200, on the 5th of July. On the 7th, two days after, they knew, as Synnott testifies, that Porter was to get the $1,000 from Wall. A few days after that the vein was discovered. The plaintiffs were there and knew all these facts. The defendant proceeded with labor and skill for ten months, employing a number of hands, until he has spent $25,000, including the purchase money. He has sold all the ore taken out by plaintiffs, and all he took out himself in his workings, and realized $2,700. Plaintiffs then bring suit and ask that defendant be required to account to them for this $2,700; that they be allowed to return to defendants the $2,200, and receive a deed for the mine. The cause of justice and good conscience is not apparent.

Judgment affirmed.

Broderick, J., concurred.

BUCK, J., Dissenting.—In the discussion of this question I shall not consider that branch of the case which is founded upon the law which requires the vendee not to mislead the vendor. While I have been unable to find any authorities that hold that the words "ore body" are synonymous with or the equivalent of the words "lode," "vein," or "ledge," and therefore have some doubt as to whether the finding that no lode or vein of ore was known, or had been discovered, is responsive to the allegation that the defendant had discovered a lode or body of ore, yet I desire to pass by that matter, which may, perhaps, be more technical than practical, and consider that portion of the action which has its foundation in the law of agency.

The complaint alleges, among other things, that said Porter (after entering the employment of plaintiffs) surreptitiously, fraudulently, and collusively, for a consideration, to wit, $1,000, paid to him by the defendant, in violation of his said employment of these plaintiffs, and in fraud of their rights, entered into the employment of the defendant, and undertook and agreed to assist him (the defendant) in obtaining the Eureka mining claims from these plaintiffs, by purchase at a price of $2,200, or a price greatly below its real value, and that by reason of said

false, fraudulent, and collusive acts of Porter, and the misrepresentations and concealments of defendant, the plaintiffs were induced to part with the property in question.

I presume it will be admitted that if this allegation is true the plaintiffs are entitled to the relief demanded in the complaint. This seems to me to be the more comprehensive and the most important branch of the case. The large ore body has, in the progress of the trial of the case, as is usual, attracted the most attention; but the gravamen of the action, it seems to me, lies in this charge of betrayed confidence, which may be true, even if, as a matter of fact, no ore vein had ever existed within the mine. This branch of the case makes the relation of Mr. Porter to the plaintiffs and defendant a vital issue. That issue is, Was he an agent of plaintiffs? If not an agent, was he a principal contracting with the plaintiffs for the purchasing the mine? If not an agent of plaintiffs, was he an agent of defendant? If not an agent of defendant, was he a party in interest with the defendant? If not, was he then the agent of both plaintiffs and defendant? And, if so, was he a factor, broker, or middleman? The law of the case is different in the several relations, and cannot be determined until this relation is adjudicated. The plaintiffs have a right to demand a finding of fact determining this matter. I am unable to find such a one in the decision of the case by the court below.

The second alleged finding of facts details a conversation between plaintiffs and Porter, whereby a proposition of employment is tendered by plaintiffs and responded to by Porter, and closes with the finding as a fact "that Porter was not invested with any authority to effectuate a sale or bind the plaintiffs or the title to the mine." The vital question, however—Did he have any authority, and if so, what was it?—is not determined.

The fifth alleged finding of facts states that plaintiffs informed Porter that they would sell the mine at $2,000, but that out of said sum they could pay no commission; but there is no finding, there or elsewhere, as to whether Porter agreed to act as their agent in selling it at that price, or whether he agreed to buy it.

The findings are so indefinite that different minds arrive at different conclusions as to what was the relation of the parties.

Again, looking into the evidence for the purpose of ascertaining whether the finding that Porter was not invested with authority to sell or to bind the mine, it seems that all the evidence on that point is directly at variance with the finding.   In determining the authority of Porter, on the theory that he was employed by plaintiffs, we must look at what he was employed to do, and not what he did under the employment.   Synnott, one of the plaintiffs, testified: "I told Porter if he would sell the Eureka for $2,500 we would give him ten per cent.   Porter replied, if he got through trying to sell the Homestake he would try and sell ours."   Again, Synnott says: "I told him I would give ten per cent if he sold the mine," etc.   Again, Porter himself says, "Synnott and Welch gave me a sort of verbal bond if I would sell the property," etc.   He adds, "I made a sale to Wall."   On page 64 of Transcript Porter says, "They told me if I could sell for them and bring them $2,000, that was all they asked."   On page 63 he says: "I had authority to sell the mine from about the middle of June.   I made sale of it on the 5th of July."   It is claimed that it appears from what he did that he had no authority to sell.   But the charge is that he did not do as he had agreed to do, and it would be a dangerous practice, if, on such a charge, we should determine what he was authorized to do by what he actually did.   I am unable to see that this finding of fact is supported by the evidence; it seems rather to be directly contrary to the evidence of the contracting parties.

If I understand the opinion of the majority of the court, just read, it is based upon the theory that the findings are sufficient to show that Mr. Porter had a contract or verbal agreement with plaintiffs whereby he had what is sometimes called an option to sell, and that, under said authority, he had a right to sell and to appropriate to himself all that he might get over $2,000.   The words of the parties are that he is to sell.   Nothing is said of an option.   Porter says that he called it a verbal bond.   I am unable so to construe their contract.   The stipulation that he was to have all over $2,000 if he should sell (if such there was) was simply the measure of his compensation.   It could not alter his relations to the plaintiffs, or his obligations to them.   Assuming the findings to show such a contract, I am unable to see

that Porter stood in any other relation than agent of plaintiffs. If I understand the nature of the contract, often made by miners, which is referred to as bonding a mine, it is an agreement between two principals, to the effect that one will sell to the other at a stipulated price within a given time. In *Finerty v. Fritz,* 1 Morr. Min. Rep. 439, cited in the opinion of the court, such a contract is held to be a sale. The agreement between plaintiffs was not such a bonding, for Porter himself testifies that, "I never made a bargain to buy the property or an arrangement to buy it." On page 78 of Transcript he says: "They or I could have made a sale at any time." If words are to be interpreted according to their ordinary import, Porter was employed to assist plaintiffs to sell the mine, first, at a compensation of ten per cent on the purchase price, if sold; afterward, desiring to increase his compensation, he told the plaintiffs he could only sell the mine for $1,800. This was not true. He, in fact, did sell it for $3,200. He, however, as Synnott testifies, left them with the impression that he could not do better up to the time of the sale. The plaintiffs did, indeed, get $2,200 in consequence of a third party, Gilman, offering them that amount. By chance, they protected themselves to that amount against the duplicity of their own employee. Through the representation of Porter that he could not sell for more than $1,800, and being greatly in need of money, the plaintiffs were induced to agree to take $2,000. This agreement, however, did not relieve Porter of his obligation as an agent to deal honestly with his principals, and give them all the knowledge that he possessed concerning the value of the mine. He testifies that he concealed the find for the reason that had they known of it they would not have sold for that price.

Again, it is claimed that if the findings show employment of Porter by plaintiffs, he was simply a middleman to bring the parties together, and that he could lawfully take pay from either. I understand the authorities to be that, while a middleman may sometimes take pay from both seller and purchaser, he must always deal with the utmost fairness with each. An analysis of the term affords the best explanation of the legal obligations of the parties: a man standing in the middle between two; in the center. "Center" is defined to be a point equally distant

from the extremities. The middleman must be and remain equally removed in interest from the two for whom he contracts. If he varies from this, even in the estimation of a hair, and gives to one knowledge or advantage which he withholds from the other, he loses his position as a middleman, and in the realm of equity, the law will hold him responsible for the position which he really assumes, rather than that which he advertises to occupy. Can it be said that Mr. Porter stands equidistant between the plaintiffs and defendant, when he testifies that "I did not inform the plaintiffs of the fact of my finding ore? I reported it to Colonel Wall." And, again, "I told Colonel Wall I wanted one-fourth of the mine," and that he actually received $1,000 in lieu of the quarter interest therein.

In *Walker v. Osgood,* 98 Mass, 351, 93 Am. Dec. 168, and note, Wells, J., says: "Plaintiff's employment as a broker, even if he had no authority to bind his principal, and was intrusted with no discretion in fixing the terms of exchange, and his only service was to bring the parties together, he was bound to perform that service in the interest of the party who employed him." To a certain extent, and for certain purposes, by the understanding and usage of business and the nature of his employment, a broker is authorized to act for both parties; but what he does in any relation he does as an indifferent person, and not in the interest of either party. It is claimed on the part of the appellants that there is no finding as to the fraud of defendant or his collusion with Porter.

In *Harris v. Burns,* 51 Cal. 528, the court say if the trial court fail to find on an issue of fraud raised, the judgment will be reversed.

In *Le Clert v. Oullahan,* 52 Cal. 254, the court says: "Upon the issue of fraud thus tendered the findings are entirely silent. The cause is not, therefore, in a condition to be decided." In the case at bar it is claimed that if there is no direct finding as to fraud such probative facts are found as necessarily determine the question of fraud. If this is true, it must be that it does so by alleging all the facts, circumstances, and acts of the parties connected with the transaction, in any way bearing upon the question of fraud. But an analysis of the findings will show that, while they set out as facts the conversation of the

parties as to the contract of the parties, the evidence of Porter bearing on this question is entirely omitted.  He says: "I did not inform plaintiffs about the finding of the ore, for the reason that I did not think it to be to my interest.  I was working for my own interest, and not theirs."   Also the evidence of Mr. Synnott: "Porter told us the most he could  get  was  $1,800. That was the understanding between us until the sale."

· If Porter was in the employment of plaintiffs he had no right to work for his own interest and not theirs.  If there was fraud, it arose from this very working for his own interest to the injury of his employers; and if defendant was in collusion with this working for his own interest instead of his employers', the fraud attaches to him also.   Hence the defect in the findings upon the question of fraud.

In *Norris v. Tayloe,* 49 Ill. 17, 95 Am.  Dec. 568, and reported in 1 Morr. Min. Rep. 383, is a case so nearly like the one at bar that it seems to me to determine this controversy, provided the findings should establish the facts.   The principles involved in this case are fully discussed.   Whether they do apply, or what principles of law apply to the case at bar, can only be determined when the issues of fact in the case are adjudicated.   The question of the agency of Porter, the question of fraud of Porter, and the collusion of  the defendant  in  such  fraud,  if  any existed, are the vital issues upon that branch of the case which I am discussing.  I am unable to understand the findings of the court below as determining these issues, and I am therefore obliged to dissent from the opinion of the court as just read.