594 P.2d 629

**Warren L. MALLORY and Donna Lee A. Mallory, husband and wife, Plaintiffs-Respondents,**

v.

**Peter F. WATT, H. Lanier Turner, and Charles M. Watt, Jr., copartners, doing business as Idaho Apartment Properties IV, Defendants-Appellants,**

**and**

**W. Wayne OPPEL and Twylah R. Oppel, husband and wife, Plaintiffs-Respondents,**

v.

**IDAHO APARTMENT PROPERTIES IV, a General Partnership, and Peter F. Watt, Charles M. Watt, Jr. and Harry Lanier Turner, the partners thereof in their capacity as partners, and Individually, Defendants-Appellants.**

No. 12565.

Supreme Court of Idaho.

May 7, 1979.

Dwight F. Bickel, Law Offices of Dwight F. Bickel, P. A., Boise, for defendants-appellants.

Gerald L. Weston, of Gigray, Miller, Downen & Weston, Caldwell, for Mallory.

Howard I. Manweiler, and Winston Churchill, of Wallis & Churchill, Boise, for respondents Oppel.

SHEPARD, Chief Justice.

Plaintiffs-respondents Warren Mallory, Wayne Oppel, and their spouses brought an action for specific performance on a real estate exchange contract. The district court entered a judgment granting specific performance. Defendants-respondents Peter Watt and Idaho Apartment Properties (IAP) appeal, alleging that the exchange agreement is unenforceable, and that, in any event, specific performance was improperly granted. We affirm the trial court's determination.

Idaho Apartment Properties, a partnership of which Peter Watt is the managing partner, owned a number of apartment complexes. In a casual conversation in the

summer of 1975, Watt indicated to Oppel, a licensed real estate broker, that the partnership would be willing, under the right circumstances, to sell one of its holdings which was located near Boise State University (the River Green Apartments). Oppel communicated this possibility to Mallory, a former client who owned several investment and rental properties. Mallory indicated an interest, but hesitated when he learned of the price being asked and the rate of return on the investment. Oppel informed Watt of Mallory's reluctance and Oppel conducted a rent study to ascertain the income potential of the complex. The study indicated that the rents were comparatively low and that the property could be made more attractive to Mallory by raising the rent from $175 per month per unit to $200. Watt was pleased with this study and raised the rent accordingly. Mallory took an option to buy River Green and exercised that option when the tenants accepted the increase in rent without moving out.

Initially, Oppel had proposed to Watt (IAP) an exchange of the equity in the River Green Apartments for a vacant lot in Boise owned by Mallory. This lot was referred to as the "Sherman Street property." After investigating the lot, Watt (IAP) advised Oppel and Mallory that he did not want the vacant land. Oppel then proposed that if Watt (IAP) would take the Sherman Street property from Mallory, Oppel would himself buy the property from IAP. All of the parties agreed upon this arrangement.

Briefly, the exchange agreement provided that IAP would accept the Sherman Street property for its equity in the River Green Apartments, and Mallory would assume approximately $154,000 of encumbrances against the complex, making a total purchase price of $184,000. A condition precedent of the agreement was that the Sherman Street property be sold for $30,000. In an earnest money agreement signed at approximately the same time as the exchange agreement, Oppel agreed to buy the Sherman Street property for $30,000, payable as follows: $1,110 in cash, $11,040 by applying Oppel's real estate commis-

sion to be paid from the Mallory–IAP exchange, and $17,850 by assignment of Oppel's interest in an escrow containing contract paper (the "Strate Paper"). IAP was given 20 days in which to inspect the Strate escrow paper and reject it if unsatisfactory. Neither Watt nor IAP ever exercised the right to inspect. The agreements were signed on July 21 or 22, with closings to be held on October 1.

During the month of September, while documents were being prepared for the closing, it became apparent that Watt had spent $1,070 which should have been held as tenant security deposits, that there was a $675 delinquent sewer charge, and $2,100 for tax obligations. All of those monies were chargeable to actions on Watt's (IAP) part and not to normal closing costs. Nevertheless, Watt claimed that one of the conditions of the transaction was that Watt (IAP) would need little or no cash to close and because of the deficiencies Watt (IAP) would have to tender approximately $4,500 at closing. When it appeared that the transaction might fail, Oppel agreed that he would reduce his real estate commission to cover a part of the closing costs and Mallory would carry the balance of the closing costs for the period of a year.

On October 14, 1975, two weeks after the date for closing, a meeting was held between Watt, Mallory and Oppel. Watt indicated that he was the "bad guy" and that he wasn't going to sell the River Green Apartments because he wasn't getting enough money for them. Watt offered Mallory another apartment building in substitution for the River Green Apartments. Mallory declined.

Mallory brought suit to compel specific performance of the exchange agreement or, if specific performance could not be obtained, for recovery of $35,000 damages for breach of contract. Oppel sued for his real estate commission and for specific performance of the contract to sell the Sherman Street property. Both plaintiffs also sought recovery of attorney's fees and costs as permitted by their respective contracts.

**122**

The plaintiffs prevailed at trial and each was granted specific performance. The defendants appeal.

Defendants-appellants first argue that the exchange and earnest money agreements are unenforceable. It is contended that where, as here, a broker acts in a dual capacity by representing both the buyer and seller and further acts to purchase property from one of his principals, a *per se* violation of a fiduciary relationship occurs. It is then asserted that such a breach occurred here because of actions on Oppel's part, and that this breach permits Watt (IAP) to rescind the agreement to sell the Sherman Street property. Since the sale of the Sherman Street property was a condition precedent to the agreement to sell the River Green Apartments, the defendants contend that the compliance with the latter agreement is excused.

■ There is no question that Wayne Oppel was one of the participants in an agency relationship. A real estate broker is an agent standing in a fiduciary relation to his principal. *Giese v. Tarp*, 92 Idaho 243, 440 P.2d 521 (1968). Because of this relationship, the agent is obligated to exercise reasonable care, skill, and judgment in securing the best bargain possible for his principal. *See Meerdink v. Krieger*, 15 Wash.App. 540, 550 P.2d 42 (1976). Moreover, the agent must make a full, fair, and timely disclosure to his principal of all facts within the agent's knowledge which are, or may be, material to the transaction and which might affect the principal's rights and interests or influence his actions. *Id.; see also Reese v. Harper*, 8 Utah 2d 119, 329 P.2d 410 (1958); *Anderson v. Thacher*, 76 Cal.App.2d 50, 172 P.2d 533 (Cal.App.1946). It is apparent from the foregoing that when an agent represents interests adverse to those of his principal, either by representing another party or by purchasing from his principal or both, the potential for a breach of an agent's general duty of good faith is high. *See generally*, 12 Am.Jur.2d., Brokers, § 87. It does not follow, however, that in all instances a broker is required to act as a mere middleman, or risk being

found to have violated his fiduciary obligations. So long as the broker fully discloses his dual agency or the fact that he is acting on his own account, and further acts fairly with his principal or principals, no breach of the fiduciary relationship occurs. *See Homefinders v. Lawrence*, 80 Idaho 543, 335 P.2d 893 (1959); *Synnott v. Shaughnessy*, 2 Idaho 122, 7 P. 82 (1885); *Meerdink v. Krieger, supra; Koller v. Belote*, 12 Wash. App. 194, 528 P.2d 1000 (1974); *Investment Exch. Rlty., Inc. v. Hillcrest Bowl, Inc.*, 82 Wash.2d 714, 513 P.2d 282 (1973); *In re Estate of Baldwin*, 34 Cal.App.3d 596, 110 Cal.Rptr. 189 (1973); *Brandt v. Koepnick*, 2 Wash.App. 671, 469 P.2d 189 (1970); *Frisell v. Newman*, 71 Wash.2d 520, 429 P.2d 864 (1967); Restatement (Second) of Agency, §§ 390, 392 (1958); Seavey, Agency § 150; 12 Am.Jur.2d, Brokers, § 87. The question here is whether Oppel made full and truthful disclosure of all material facts to his principals and disclosed his personal interests in the transaction.

The parties appear to be in an agreement with the trial court's finding that Oppel made full disclosure of his capacity. Defendants-appellants Watt (IAP) contend, however, that Oppel did breach his fiduciary obligations. Specifically, they argue that Oppel breached his duty by (1) failing to disclose material facts relating to the value of the apartments; (2) acting actively to keep the transaction together; (3) representing that closing would require a minimal amount of cash; and (4) offering to pay for the Sherman Street property with escrow paper without telling IAP that the market value of the escrow paper was less than face value.

■ In assessing appellants' contention, we are mindful that a broker's explanation of various aspects of a transaction must be commensurate with the education and understanding of his principal. *See Prall v. Gooden*, 226 Or. 554, 360 P.2d 759 (Or.1961). The trial court found that Watt had expert knowledge in real estate transactions of this kind. The lower court also specifically found that Watt himself had better access to the financial information affecting clos-

ing than anyone else, that there was no showing that the Strate paper would not yield as promised, and that, in sum, all material facts to this transaction were known to Watt.

Based on the findings of fact, the trial court concluded that Oppel had not breached any fiduciary duty owed to Watt (IAP). The court's conclusion of no breach of any fiduciary duty is supported by the findings of fact and those findings in turn are supported by substantial, albeit conflicting, evidence and will not be disturbed on appeal. *See Cooke v. Iverson*, 94 Idaho 929, 500 P.2d 830 (1972) [a substantially similar case involving a complex real estate exchange transaction and the duty of a real estate broker]. *See also Giese v. Tarp, supra; Brandt v. Koepnick, supra*; I.R.C.P. 52(a).

Appellants next contend that the trial court improperly granted specific performance. For support of that contention, appellants rely heavily on *Suchan v. Rutherford*, 90 Idaho 288, 410 P.2d 434 (1966), a case involving a real estate transaction and the granting of specific performance. There specific performance was granted below but reversed upon appeal, and the court stated "equity will not intervene where the aggrieved party has a plain, speedy, adequate, and complete remedy at law . ." *Suchan* is clearly distinguishable from the case at bar in that *Suchan* presented the claim of a *vendor* seeking specific performance. The court in *Suchan* specifically distinguished between situations involving a vendor as contrasted with a vendee. Further, the court in *Suchan* indicates that the granting or withholding of the remedy of specific performance of a land contract rests in the sound discretion of the court. Here no abuse of that discretion has been shown. *See Boyd v. Head*, 92 Idaho 389, 443 P.2d 473 (1968); *Scogings v. Andreason*, 91 Idaho 176, 418 P.2d 273 (1966); *Suchan v. Rutherford, supra; Bedal v. Johnson*, 37 Idaho 359, 218 P. 641 (1923); *Vincent v. Larson*, 1 Idaho 241 (1869); Annot. 65 A.L.R. 7, Restatement Contracts, § 359; 71 Am.Jur.2d, Specific Performance, §§ 6, 7.

The judgment is affirmed.

BISTLINE, J., SCOGGIN and DUNLAP, JJ., pro tem., concur.

BAKES, J., sat but did not participate.