HUTTON v. SHERRARD.

1. PRINCIPAL AND AGENT — SALES — VENDOR AND PURCHASER — AGENT'S RIGHT TO BUY ON OWN ACCOUNT—BROKERS.'
   As a general rule the agent who has property in his hands for sale may not purchase it, but the rule is not applicable to a real estate agent having authority to sell a parcel of real property for a stated price and to retain all that he could secure in addition thereto as his fee or commission.

2. BROKERS—PRINCIPAL AND AGENT—VENDOR AND PURCHASER.
   The broker will not be allowed to purchase property where he has a duty to perform that is inconsistent or in conflict with the relation of purchaser.[1]

3. SAME—GOOD FAITH—DISSATISFACTION—CONTRACTS.
   The principal who has reserved the right to approve all contracts made by his real estate broker, in selling lots of a subdivision, upon an arrangement to have all the broker could secure above a fixed price for the lots, must exercise his right of disapproval honestly and in good faith: the dissatisfaction must not be pretended or in bad faith.

4. SAME.
   And the owner of the lots could not refuse to sell to the agent as a purchaser, without any ground to be dissatisfied with the financial standing of the proposed vendees, who referred to their banks for their standing, refusing to furnish a financial statement, but offering to pledge their equity in other contracts made for the sale of defendants' lots and worth about $10,000, as security for the price named in the contracts.

Appeal from Wayne; Codd, J. Submitted November 25, 1913. (Docket No. 25.) Decided December 19, 1914. Rehearing denied April 28, 1915.

Bill by George E. Hutton and another against Charlotte Berry Sherrard and others for specific perform-

---

[1] As to the right of a broker to purchase real estate listed with him for sale, see note in 20 L. R. A. (N. S.) 1158.

ance of a contract. From a decree for defendants, complainants appeal. Reversed.

*Beaumont, Smith & Harris,* for complainants.

*Angell, Boynton, McMillan, Bodman & Turner,* for defendants.

BIRD, J. In June, 1905, complainants entered into an agreement with Joseph Berry of Detroit, whereby they were to act as his selling agents, for a period of two years, of certain lots owned by him in Fairview village. Certain preliminary work was necessary to get the lots ready for the market, and it was stipulated that complainants should look after this work, such as grading roads, planting trees, and constructing sidewalks, the cost of which was to be borne by Mr. Berry. The cost of advertising and selling and making collections on deferred payments was to be borne by complainants. Lots were to be sold for cash or on contract. A minimum sale price was fixed at $28.50 per front foot for Jefferson avenue lots, and $200 each for all other lots, plus the cost of the sidewalk appurtenant thereto. The compensation of complainants was stipulated to be all they might realize on a sale over and above the minimum selling price. A down payment of $25 was to be made on all lots sold on contract, and all contracts were to be subject to the approval of Mr. Berry. The preliminary work was carried on by complainants, and the sale of the lots was progressing when Mr. Berry died in 1907. A new contract was then made with the heirs and administrator of Mr. Berry's estate on substantially the same terms as the original one, save an increase in the minimum selling price of the Jefferson avenue property to $36.50 per front foot, and an increase to $310 for the other lots. This contract expired on January 1, 1910. On December 31, 1909, complainants ten-

dered to defendants $300 as the down payment on 12 lots remaining unsold, with themselves named as the purchasers, and demanded the execution and acceptance of the contracts. Defendants refused to approve and execute them, and this bill is filed to compel such execution. They justify their refusal upon the grounds:

(1) That complainants, as selling agents, had no legal right to sell the lots to themselves.

(2) As all contracts were subject to the approval of defendants, they had a right to disapprove of any contract tendered without assigning any reason for their refusal.

1. It is a general rule of law that an agent for the selling of property may not sell it to himself. *McNutt* v. *Dix*, 83 Mich. 328 (47 N. W. 212, 10 L. R. A. 660) ; *Green* v. *Knoch*, 92 Mich. 26 (52 N. W. 80). The reason why public policy has so decreed is to prevent the selfish interest of the agent from coming in conflict with his duty to his principal. In all transactions where the agent's loyalty is liable to be affected by his selfish interest, the general rule will apply even though no fraud is practiced. *McKay* v. *Williams*, 67 Mich. 547 (35 N. W. 159, 11 Am. St. Rep. 597). Measured by this test, is the transaction before us one to which the rule should be applied? The minimum price fixed in the contract belongs to the principal. If a sale is made, the principal is entitled to the minimum sum, plus the cost of the sidewalk, and nothing more. The agent's diligence in securing the best price obtainable therefor is no benefit to defendants beyond the minimum price. Whether a lot sells for $1 or $100 in excess of the minimum price, the result is the same to the principal; he neither gains nor loses by the transaction. This differs widely from a contract which fixes a minimum selling price and a percentage commission. In such a case the principal profits by

any price in excess of the minimum, whereas, in the case before us, he profits nothing beyond the minimum price.

Warvelle, in his work on Vendors (vol. 1 [2d Ed.] § 226), in discussing this subject, has the following to say:

"In accordance with the foregoing rule it has been held that an agent cannot become the purchaser of property confided to his care, and that a purchase made under such circumstances carries fraud upon its face. But this, perhaps, is carrying the application of the rule to extreme lengths; for the true spirit and meaning of the rule is that the agent shall not so act toward the subject of the agency for his own benefit as to work injury to his principal. He will not, therefore, be allowed to purchase where he has a duty to perform which is inconsistent with the character of purchaser, nor to speculate for his private gain with the subject-matter committed to his care. This may be regarded as the true extent of the rule; and an agent placing himself beyond it may lawfully contract with his principal with relation to the property."

The case of *Synnott* v. *Shaughnessy,* 2 Idaho (Hasb.), 122 (7 Pac. 82), is in point. In this case a similar contract was involved and the same question was raised as to its validity. The court said:

"He [the agent] was at perfect liberty to get all he could above $2,000. He could, with perfect propriety, become the purchaser himself."

We are of the opinion that, inasmuch as the record shows that the purchase of the property by complainants would be in no wise inconsistent with their duty as agents of the defendants, they had a right to purchase the lots on their own account.

2. The complainants contend that defendants' refusal to approve the contracts was equivocal, arbitrary and not a good faith refusal. The defendants take the position in this court that their refusal is sufficient without assigning any reason therefor, and in support

thereof, cite the familiar case of *Wood Mowing Machine Co.* v. *Smith*, 50 Mich. 565 (15 N. W. 906, 45 Am. Rep. 57). The reserved right of approval in the contract involves the judgment of the defendants, and therefore appears to fall within the doctrine of that case. But it is said that, even in cases falling within that rule, the right must be exercised honestly and in good faith. The dissatisfaction must be actual and not feigned, real and not merely pretended. 9 Cyc. p. 624; *Isbell* v. *Anderson Carriage Co.*, 170 Mich. 304 (136 N. W. 457). It is also said in *Hartford Sorghum Manfg. Co.* v. *Brush*, 43 Vt. 528, that if the purchaser is in fact satisfied, but fraudulently and in bad faith declares that he is not, the condition is performed. The question, therefore, presented is whether we can say on the face of this record that bad faith was the basis of defendants' refusal to approve the contracts.

The obvious purpose of this undertaking was to dispose of the lots on the subdivision at a satisfactory price. And the only apparent object of reserving the right to approve the contracts was to pass upon the financial responsibility of those desiring to purchase. When complainants tendered the contracts in question for approval, defendants replied requesting a financial statement of complainants. In response to this request complainants refused to make a written statement, but instead referred defendants to their bankers, indicating who they were, and made the following offer of security:

"You hold now, land contracts of various parties, wherein our equity at this date, according to our record, amounts to $10,374.77.

"If at any time we should default in making any payment of principal or interest on any of the contracts submitted by us to you on the 30th *ultimo*, you are hereby authorized to apply upon any such contract in default, enough of the moneys collected by you from time to time, for us, to satisfy such default in pay-

ment, and this authority is to be a continuing one until one-half of the principal and all accrued interest is paid upon the contracts so submitted to you."

The defendants being unmoved by this information and offer of security, the complainants filed this bill of complaint. In their answer the defendants deny they based their refusal on the financial irresponsibility of the complainants. That portion of their answer reads:

"They admit that before refusing to accept said payment on said contracts, they asked for a financial statement showing the responsibility of Messrs. Hutton, Tigchon & Nall, and that such statement was not exhibited to them, but show that their refusal to enter into said agreements was not based upon the financial irresponsibility of the proposed purchaser, but was within their rights as defined by said agreement."

Later, at the hearing, Mr. Hoyt, who represented the administrator, testified that:

"At the time we declined to make these contracts, we questioned their financial responsibility. We did not get to a point of passing on it because we were not furnished the information for which we asked. Our position in part was that, not having been furnished that financial statement, we would not sell to them. The other part was that they had no right, no legal right, to make this contract for themselves under the sales agreement that we had with them."

In view of this testimony we must assume that defendants based their refusal to approve the contracts in part upon the financial irresponsibility of the complainants. In order to meet this objection, complainants referred defendants to their bankers in the city of Detroit, and to further satisfy their misgivings, they offered to permit defendants to retain their equity in lots already sold, amounting to upwards of $10,000, as it was collected, and apply it upon the purchase price of the lots in question. Defendants made

no reply to the offer of security, and refrained from making any inquiry of complainants' bankers. And they say in their testimony that they did not pass upon complainants' financial responsibility because they were not furnished the information requested. We think it can hardly be said to be consistent with good faith to question a business man's financial standing, and when it is met by a reference to his banker and an offer of security to ignore the offer of security and refuse to investigate when the avenue leading to the desired information is open. Such conduct would not pass current in the business world as good faith, and we cannot accept it as such. But it is said that the defendants deny they were referred to complainants' bankers. If we consider this denial as conclusive, the fact still remains that the administrator had at its command all the avenues of information concerning the financial standing of business men about town that a large trust company usually has, and had its desire been to learn the financial standing of these complainants, we cannot believe it would have been very long without the desired information.

Another phase of the testimony which has influenced us in reaching a conclusion on the question of good faith is the fact that complainants have been permitted to become the owners of several defaulted contracts for lots on the subdivision with the knowledge and consent of the defendants. Why their financial ability should be questioned in one case and not in another of like kind is a discrimination not easily understood.

Complainants charge in their brief that defendants were moved to withhold their approval of the contracts because of the enormous increase in the value of the lots since the contract of agency was made. Whatever may have been the motive for their refusal,

we are satisfied that their dealings lacked the candor and good faith which their agreement with the complainants demanded of them. For this reason the decree of the trial court must be reversed, and one entered in harmony with these conclusions. The complainants will recover their costs in both courts.

McALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, MOORE, and STEERE, JJ., concurred.