MOREHEAD MANFG. CO. *v.* ALASKA REFRIGERATOR CO.

1. CONTRACTS—WARRANTY — DISSATISFACTION — CAUSE FOR REJECTION—RULE.

Where the subject-matter of a contract involves a question of individual taste or sentiment rather than of utility, the good faith of the party declaring his dissatisfaction cannot be inquired into; but where the subject-matter of the contract relates to a thing which is ordinarily desirable only because of its commercial value or of its mechanical fitness, it is held that the party must act in good faith and must be honestly dissatisfied.

2. SAME—QUESTION FOR JURY.

In an action by plaintiff on a written contract for certain material furnished for installation in defendant's factory, guaranteeing that the system sold will "handle all of our exhaust steam and all of our live steam that we use for heating purposes throughout the dry kilns and entire plant, * * * making a saving of 5 per cent. in fuel daytimes and 20 per cent. increase of heat in daytimes on the fans, * * * reduce the back pressure on the engine one-third," and agreeing that if·the equipment does not do the work as guaranteed plaintiff will remove the same without expense to defendant, on conflicting testimony the question of whether defendant arbitrarily and in bad faith asserted dissatisfaction and refused to accept and pay for the equipment which in fact came up to the guaranty, because through information furnished by plaintiff's agent defendant could get the desired results without it, was a proper question for the jury.

3. SAME—EVIDENCE—ADMISSIBILITY.

The court below was not in error in excluding a book containing a record of temperatures taken two years before, where no record was kept for the intervening period, nor any evidence offered that the condition and equipment of the plant was then the same as when the contract was entered into.

4. SAME—WARRANTY—TRIAL—INSTRUCTIONS.

An instruction by the court that the guaranty to "give 20 per cent. increase heat daytimes on the fans," meant not

the temperature in the kilns, as defendant contended, but at the mouth of the tube or fans, *held*, not erroneous, since the sentence of simple words required no interpretation or evidence to determine its meaning.

5. SAME—ADMISSIONS—EVIDENCE—TRIAL—INSTRUCTIONS.

A letter signed by defendant's assistant manager, stating that certain instructions as to changes to be made had been given to defendant's engineer, and that the traps were then working O. K., keeping the system drained dry, was competent testimony for its bearing upon the issue, and upon defendant's claim that it was obtained by subterfuge, that it was signed at the request of plaintiff's agent without knowing its contents, and that defendant's engineer had no knowledge of the letter, and never received any such instructions referred to, its weight was for the jury, and it was error for the court, in his instructions, to discuss said letter argumentatively, indicating his opinion as to its effect.

6. SAME.

Where the testimony as to whether the warranty as to reduction of back pressure had been fulfilled was conflicting, it was a question for the jury, and it was error for the court to discuss said question argumentatively, practically taking it from the jury.

Error to Muskegon; Sullivan, J. Submitted June 13, 1918. (Docket No. 88.) Decided December 27, 1918.

Assumpsit by the Morehead Manufacturing Company against the Alaska Refrigerator Company for goods sold and delivered. Judgment for plaintiff. Defendant brings error. Reversed.

*Cross, Foote & Sessions,* for appellant.

*Hatch, McAllister & Raymond* and *Willard J. Turner,* for appellee.

STEERE, J. Plaintiff is a corporation located in Detroit, Michigan, engaged in the manufacture of specialties for drainage of steam apparatus used for heat-

ing, evaporation, power purposes, etc., and issued a catalogue of its products in which was advertised what is called the "Morehead Trap" or "Morehead System" manufactured for that purpose. Defendant is a corporation located at Muskegon Heights, Michigan, engaged in the manufacture of refrigerators. In 1911, its plant was heated by exhaust steam which after performing its purpose in the engine was utilized to heat the feed water for its boilers and passed through heating coils into its dry kilns for curing or drying lumber.

Defendant's engineer, Thomas Pedler, had requested and received a catalogue from plaintiff, which was accompanied by a letter stating that its agent, Mr. Crowley, would call upon defendant in reference to the matter if desired, to which defendant replied it would be agreeable for him to call. Crowley was an engineer particularly experienced in matters relating to drainage of steam-heating apparatus, and under directions from plaintiff visited defendant's plant as soon as engagements permitted. As a result of their negotiations defendant sent plaintiff the following signed order:

"THE ALASKA REFRIGERATOR COMPANY,
"MUSKEGON, MICHIGAN, 10/16/11.
"To THE MOREHEAD MANUFACTURING COMPANY,
"Detroit, Michigan.

"Order No. 9865.

"Please ship us promptly to Muskegon, Michigan. via......................the following goods:
"Please enter our order for
"1 No. 5 Condenser
"1 No. 5 Return Trap
"1 No. 1 Return Trap
"1 No. 1 Receiver
"Price $775 f. o. b. Muskegon, Michigan.
"Your representative, Mr. Crowley, guarantees that this equipment mentioned above will handle all of our

exhaust steam that we use for heating purposes throughout the dry kilns and the entire plant.

"He guarantees to make a saving of 5 per cent. in fuel day times and 20 per cent. increase in heat day times on the fans.

"Night times, holidays, and Sundays he claims a saving of at least 20 per cent. in fuel and 20 per cent. increase in the heat on the fans. He also agrees to reduce the back pressure on the engine one-third.

"The temperature of No. 3 and No. 4 kilns varies from 110° to 115° at the kiln; the temperature of No. 1 and No. 2 kilns is 140° to 150° at the kiln.

"This complete equipment is to be furnished subject to 60 days' trial and subject to our approval, as per the guarantee above.

"Mr. Crowley agrees that if this does not do the work as he guarantees it, to remove the equipment without any expense to the Alaska."

To which plaintiff responded on October 18th as follows:

"THE ALASKA REFRIGERATOR COMPANY,
        "Muskegon, Michigan.

"*Gentlemen:* Your order No. 9865 at hand and contents noted. The same will receive our very prompt attention. We note guarantees which have been inserted in this order and wish to congratulate your secretary on the same. We don't think that he overlooked anything.

"We at the same time beg to advise you that Mr. Crowley is a man who has had lots of experience in this line and knows the goods thoroughly, and knows how to install them, and knows what to do, and we cheerfully accept the conditions laid down by him, and we don't doubt for a moment but he can do just what he says he can do."

On October 20th defendant sent plaintiff the following supplemental order:

"Order No. 6543.
"Please ship us promptly to Muskegon, Michigan, by freight the following goods:

"4—3" Brass Rouse check valves
"2—1" Brass Rouse check valves
"Same as you recommended for our use.

"Mr. Pedler stated that you suggested buying these for us as you might be able to save us $2.00, or thereabouts, on a valve. We understand that these valves are necessary in installing your equipment, so kindly plan to order these for us, if that is the case, so they will be here when the other material arrives."

This equipment was shipped on October 27, 1911, put into its plant by defendant, which was to make its own installation according to catalogue directions and instructions which Mr. Crowley had given when negotiating the sale while at Muskegon Heights.

On December 9, 1911, defendant wrote plaintiff complaining that the Morehead System which it had installed according to catalogue and as Crowley suggested was not working satisfactorily, the particular complaint being:

"The trap over the boilers does not take care of the water from the trap in the basement and is working continuously to get rid of the supply."

On December 12th, Crowley visited the factory and examined the installation to ascertain the difficulty, if any. He testified that the only trouble was due to a failure to follow instructions, but even as installed he found on testing it out the equipment was meeting the full requirements of the guaranty. Before leaving he gave further instructions and obtained the following paper, signed by defendant per J. L. Gillard, assistant of defendant's general manager, who was then in charge of defendant's office and had a hand in preparing the same, and who stated he did not think his right to sign defendant's name on any business which came up in the office had been questioned during the past 15 years:

"MUSKEGON, MICHIGAN, 12/12/11.
"MOREHEAD MANUFACTURING COMPANY,
  "Detroit, Michigan.
  "*Gentlemen:* Have given instructions to John Pedler to raise the trap as high as possible and also put

2-inch lines in boiler instead of 1¼-inch and which will be done as soon as possible. The traps are working O. K. at the present time, keeping the system drained dry.

"We will follow up the above.

"ALASKA REFRIGERATOR COMPANY,

"J. L. G."

On December 27th defendant wrote plaintiff that the system was not giving results and it had discontinued its use, asking for instructions at once as to the disposition of the traps, following which Crowley again visited the plant, made thorough inspection and tests which showed, as he testified, that the apparatus when operated exceeded the guaranty, although his instructions as to raising the trap and use of a 2-inch pipe in boiler had not been followed; but he also discovered from conversations with Mr. Ford, defendant's manager, and on inspection of the plant, that they had availed themselves of the information received from him, in regard to the proper method of draining steam apparatus as worked out by plaintiff, and applied it to defendant's plant, securing the desired results without using the equipment bought from plaintiff. Of this he testified:

"In my conversation with Mr. Ford, Mr. Ford acknowledged that he was willing to pay me for my information for increasing the heat in their kilns, but he didn't believe in paying for the traps. Through our demonstration they could see where they could get almost the same results, or practically the same results by taking my information and carrying on the old system, so he was willing to pay me for my information given them, but he wouldn't pay for the traps. He didn't make any claim that I know of at that time that we had failed to fill our guarantees because it had been proved that I had done what I agreed to. I told him I wasn't selling information. I was selling Morehead steam traps. * * * On my tests there I found that they were using the by-passes open on the pumps, which is the same as I recommended on my traps."

Without direct reference to Crowley's testimony as to such proposal, Ford testified in general denial:

"I have no knowledge that any ideas were suggested by these machines or by Mr. Crowley that were utilized in continuation of the old system of heating. * * * The matter of the steam plant and the kiln and the heating system and the electric light system is left with the chief engineer."

On January 24, 1912, defendant wrote plaintiff:

"We have made further tests of your traps, and we find we can get better results with our own pumps and have accordingly discontinued the use of the traps and would ask you to kindly send us shipping instructions."

Claiming that the equipment it furnished fully complied with the guaranty plaintiff demanded payment and on refusal brought this action for the contract price in the circuit court of Muskegon county where on trial by jury it recovered verdict and judgment for the same.

Defendant's assignments of error include the proposition that by the terms of the contract it had an absolute right to reject the equipment as unsatisfactory and a verdict should therefore have been directed in its behalf as requested; that testimony offered by defendant was erroneously rejected and the charge as given was erroneous in the court's construction of the contract, and various other specified particulars.

Upon the first proposition defendant contends that by the terms of the contract it had the option, and absolute right as a matter of law, to determine whether the equipment was satisfactory to it and if not to reject the same under the ruling in *Wood Mowing Machine Co.* v. *Smith*, 50 Mich. 565 (45 Am. Rep. 57), and analogous cases cited; while plaintiff contends that the subject-matter of the contract was only desirable for mechanical fitness and value in increasing the effi-

ciency of a manufacturing plant, involving no question of personal sentiment or individual taste, making the refusal a question of whether it was in bad faith or honest dissatisfaction because of failure to meet the guaranty an issue of fact for the jury under the testimony.

The contract provides that the equipment is to be furnished subject to defendant's approval, "as per the guarantee above." The guaranty above is that the system sold will "handle all of our exhaust steam and all of our live steam that we use for heating purposes throughout the dry kilns and entire plant, * * * make a saving of 5 per cent. in fuel day times and 20 per cent. increase of heat in day times on the fans, * * * reduce the back pressure on the engine one-third," and agrees that if the equipment does not do the work as guaranteed plaintiff will remove the same "without any expense to the Alaska."

Defendant based its refusal to accept the equipment on the ground that it did not do the work as guaranteed. Plaintiffs claimed that although not installed as directed, it did on thorough test prove to more than fill the guaranty. The testimony in the case was largely devoted to that square issue of fact. A claim was also made by plaintiff that defendant's refusal to accept was arbitrary and in bad faith, it having availed itself of information furnished by Mr. Crowley which enabled improvements to be made in the plant to produce the desired result without utilizing plaintiff's system, which was also a disputed question of fact.

The case of *Wood Mowing Machine Co.* v. *Smith, supra,* is discussed and the true rule stated in *Hutton* v. *Sherrard,* 183 Mich. 359 (L. R. A. 1915E, 976). This rule is also concisely stated in 13 C. J. p. 678, as follows:

"It would seem that, where the subject-matter of the contract involves a question of individual taste

or sentiment rather than of utility, the good faith of the party declaring his dissatisfaction cannot be inquired into. But where the subject-matter of the contract relates to a thing which is ordinarily desirable only because of its commercial value or of its mechanical fitness, it is held that the party must act in good faith and must be honestly dissatisfied."

Under the claims of plaintiff and conflicting testimony, the question of whether defendant arbitrarily and in bad faith asserted dissatisfaction and refused to accept and pay for the equipment, which in fact came up to the guaranty, because through the information furnished by Crowley it could get the desired results without it, was a proper question for the jury.

Of the rulings upon objections to offered testimony, that most strenuously urged as error by defendant is the exclusion of a book which Pedler testified contained a record of temperatures kept by him in 1909 taken at No. 2 kiln, the fan, and at the return of the air coming back into the fan room. He testified that he also kept records of temperatures for 1910 and 1911 but they were lost when a new roof was put upon the engine room. A book which he produced showing records of temperatures taken in 1912, which he stated he started to take when Crowley was out there, was admitted in evidence against the plaintiff's objection although copied from what he called the "pencil book" which was not offered, and defendant was allowed full latitude in whatever proofs and records it desired to offer as to temperatures and other matters relating to the equipment and operation of its plant at, and a reasonable time before, the contract was made, as well as after, but the court excluded the book for 1909 as relating to a too remote and disconnected period. We find no error in this ruling; the records in that book were made nearly two years before the contract was entered into, were followed by no continuing record of the intervening

period or any evidence that the condition and equipment of the plant was then the same as when the contract was entered into.

It is further earnestly contended that the charge wrongly construed the contract and was made prejudicially unfair to defendant by argument in which the court practically decided questions of fact which should have been impartially left to the jury. Upon the warranty in the contract of an increased temperature of 20 per cent., the court instructed the jury that it meant not the temperature in the kilns as defendant contended but at the mouth of the tube or fans, saying in part:

"Now, still farther, to justify that conclusion, that is the very construction that the parties themselves put upon this contract, by the undisputed evidence in this case. Why do I say that? I say that because Mr. Pedler took Mr. Crowley out there at the time that he came to investigate and see if there was anything wrong, took him out to those flues, not out to the kilns at all, and pointed out the thermometer there, and there he took the readings of the thermometer, at that place, so that it is the construction that was placed by the parties upon the meaning of that contract, so that you are to take that."

While perhaps unnecessarily stressed by argument, this instruction was not erroneous as applied to the warranty to which it was directed—to "give 20 per cent. increase heat day times on the fans." That plain sentence of simple words requires no interpretation, or evidence to determine its meaning.

But unfortunately the charge was not limited in argument to construction of the contract. In dealing with the testimony the court by argument quite clearly indicated an opinion on important controverted facts which were for the jury.

Pedler testified that when installing the equipment he carefully followed the directions in the catalogue

and instructions given by Crowley when the order was taken; that Crowley knew the size of the pipe going into the boiler and gave no instructions to change it. Crowley also admitted he did not then direct that it be changed. He testified that on December 12, 1911, when he visited the plant on defendant's complaint, and wrote the letter of that date signed by Gillard, the equipment was filling the warranty although his instructions had not been followed. Gillard signed the letter at his request. It stated certain instructions had been given for changes, including a larger pipe. Pedler testified he did not know what the letter contained, was not consulted when it was written, and did not promise to put in the two-inch pipe; that he did raise the trap higher as suggested by Crowley when they were looking over the plant but had not changed the pipe. Gillard testified he knew nothing about the facts stated in the letter and signed it on Crowley's plea that he "wanted a paper to show he had been there," doing it primarily to show that fact and the date, and also with the idea of working out his suggestions.

The situation at that time is in marked dispute. Crowley testified that the equipment was working up to the warranty and plaintiff had then fulfilled its contract, although his instructions had not been followed. Pedler testified all instructions as to installment had been fully complied with and the equipment failed to better conditions in the particulars guaranteed. On the conflicting theories and testimony of both parties each had fulfilled its contract obligations and the other had not. This letter was competent testimony for its bearing upon the major issues of fact involved. It is claimed and denied that the letter was obtained by subterfuge. It was the function of counsel to argue and the jury to determine what weight should be given it in connection with all the other testimony in the

case. The court emphasized and dwelt upon it partly as follows:

"And this last letter—it is all important; it all goes together—is important because it was written there in the office of the Alaska Refrigerator Company and concerning the single complaint that they had made in the letter before that, and there they say that that had been remedied, in writing, put it down in black and white, and there also was the promise to follow out the placing of those lines in the boiler, putting in a 2-inch pipe in place of an inch and a quarter pipe. They said they would follow up the above, and do whatever other suggestions was made by Mr. Crowley. They didn't do that; they didn't do that."

Defendant contended that the warranty to reduce back pressure on the engine was not fulfilled. Plaintiff claimed that it was. Pedler and Crowley were the principal witnesses on that subject. Their testimony was in direct conflict in various particulars. Each assumed to explain the meaning of back pressure and manner by which it could be reduced. Pedler testified that in defendant's plant they used a valve in the exhaust line, and explained how it operated for that purpose. Asked: "Q. What was the result of these traps with reference to that?" He replied: "It didn't make any difference whatever."

Crowley testified in relation to a vacuum in the system working to that end which he said did not necessarily have to be maintained through the whole system. Asked: "Where is this vacuum maintained?" He answered: "In the tank of the trap. Q. Is that over the entire system? A. No, sir; just on my condenser trap running back into the system of the tail pipes of the heater. Sometimes it recedes way back in the heater."

It was contended by defendant that if there was not a continuous vacuum on the whole system the back pressure was not and could not be reduced one-third.

Under the testimony as to scientific principles involved, methods and results, the question of meeting the warranty as to reduction of back pressure was clearly one of fact. This the court discussed argumentatively and practically took from the jury, saying in part as follows:

"It isn't enough for a man to say that the back pressure was reduced. That is simply a conclusion. But in relation to matters of this kind it would be very easy indeed to go into this matter and make an experiment to determine whether the back pressure was reduced or not, very easy to know how much the back pressure was before those traps were installed. They have told you how that might be done in relation to the safety valve that they had there, and they haven't shown any change as far as that is concerned. I call that to your attention. They had the right and it was easy for them to make experiments to determine about those other matters, but they haven't made any experiments or anything of that kind, and, as I said before, a simple conclusion made by a witness, even Mr. Pedler, that the back pressure was not reduced is not sufficient, because the pressure before the time of the guarantee and the pressure after the time of the guarantee was material, and it is for the defendant to show by some proof that the court tells the jury should be accepted as proof in relation to that matter."

The court did not, however, specifically point out to the jury what proof should or could be accepted in relation to that matter.

More or less argument of the facts along similar lines runs through the court's discussion of the testimony in this lengthy charge, disclosing views or impressions from which a jury would unavoidably be advised of the court's opinion as to issues of fact. In *McDuff* v. *Journal Co.*, 84 Mich. 1, it is said:

"Appellate courts must presume that one occupying so important a position as that of circuit judge can influence a jury."

This charge considered as a whole in the light of the verdict following its tenor leads to the conviction that such was the case here; which prejudicially deprived defendant of its right to a fair trial of the facts in dispute by a jury whose sole duty it was to independently determine them under applicable principles of law impartially given by the court without argument of facts. *Hine* v. *Commercial Bank,* 119 Mich. 448; *Walts* v. *Walts,* 127 Mich. 607.

The other errors assigned do not call for serious consideration or are such as not likely to occur upon a retrial.

The judgment is reversed, with costs, and a new trial granted.

OSTRANDER, C. J., and BIRD, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.