## McNENY et al. v. RADFORD.
### No. 1253.

Court of Civil Appeals of Texas. Eastland.
April 13, 1934.

Rehearing Denied May 11, 1934.

Touchstone, Wight, Gormley & Price and Phil L. Kelton, all of Dallas, for appellants.

W. E. Lessing and Cox & Hayden, all of Abilene, for appellee.

FUNDERBURK, Justice.

McNeny & McNeny by this suit seek to recover of J. M. Radford commissions claimed to be due under a contract which was subsequently modified. The original contract was as follows:

"McNeny & McNeny
"Realtors

"Chain Store Leasing

"City Abilene, Texas, Population 30,000 Trade Territory .500,000 Street and No. Northwest Corner Pine & Third Sts. Term 30 yrs. Lease Begins Upon completion of building Lease Price $13,000 gross 10 yrs; $14,000 gross 10 yrs; $15,000 gross 10 yrs.

"Size of building 50 x 140 feet Size of lot 50 x 140 feet

"No of stories ———— Alley Yes

"Size of basement None Size of 2nd Floor. As specified

"Name of Tenants, Rentals Paid, Expiration Dates: Property at present is a vacant lot

"Taxes ———— Insurance Premiums ————

"Owner's Allowance for Improvements Owner to Construct building with first and second floors as to specifications of chain Condition of Building no building

"Estimated Remodeling Costs New building

"Ceiling Heights: Basement ———— 1st Floor

"Other Floors ————

"Columns: (Location and Distance Between) As specified

"Location of Elevator As specified Location of Stairway As specified No. of stores one Character of Front As specified Party Walls No Brick Walls Yes Street level flush Heating System: (Kind) Gas Heat Furnished ————

"Sale Price ——— Cash Payment ———
Balance ———

"Owner J. M. Radford Phone ——— Owner's Address ———

"Radford Grocery Co., Abilene, Texas.
"McNeny & McNeny, Realtors

"Gentlemen: In consideration of the services to be rendered by you, I hereby give you the exclusive agency for the lease of my property, abovedescribed for a period of sixty days from this date and thereafter until withdrawn on the terms indicated herein. And upon making said lease on such terms, or such others as I may accept, I agree to pay you a commission of 2% of the total consideration named in the lease.

"[Signed] J. M. Radford.
"Witness [Signed] H. N. Harrison."

This contract was alleged to have been made on or about November 19, 1928. The allegation as to the modification was that subsequently (January 17, 1929, as shown by the evidence) the stipulated rental was changed from the amount set out in the original contract to $12,000 gross 10 years; $13,000 gross 10 years; $14,000 gross 10 years. It was alleged that, pursuant to said contract, plaintiffs, on or about, April 1, 1929, secured as a tenant, in accordance with the terms of said contract, Isaac Silver & Bros. Company (hereinafter called Silver), "who was ready, willing and able to perform its portion of the lease contract," of which defendant was advised, "but for some reason unknown to" plaintiffs, "the defendant failed and refused to carry out his portion of the lease contract."

The defendant, in addition to exceptions and general and special denials, alleged that Silver had prepared and demanded execution of a lease, provisions of which were inconsistent with the listing contract in the following particulars: "(1) That the rentals begin 30 days after the completion of the building and improvements. (2) That this defendant install certain plumbing fixtures in a kitchen in said building. (3) That this defendant furnish said building with electric fixtures and to install call bells and an interior telephone system. (4) That this defendant build a mezzanine floor in said building to be completed with desk and paneled rail for an office. (5) That this defendant build and provide a candy room, a receiving room, girls rest room, and fixture room. (6) That this defendant paint the entire exterior of the building. (7) That this defendant assume to keep said building in repair during term of said lease, and further provided that

the lessee have the right to assign said lease or any part thereof or sublet any part of the premises covered by said lease." It was alleged that "all of which provisions were demanded and insisted upon by the said Isaac Silver & Bros. Company, and by reason of this defendant refused to further negotiate with the said Isaac Silver Bros. Company as to the character of building to be built on said premises, and the said Isaac Silver Bros. Company never at any time offered to enter into a lease contract with this defendant according to the terms as contemplated in the instrument set out in plaintiffs' petition."

When the parties had finished the introduction of their evidence, the court gave a peremptory instruction to the jury to return a verdict for the defendant. From the judgment entered in accordance with the verdict so returned, the appeal is prosecuted by the plaintiffs.

The undisputed evidence established the alleged contract and modification of same. The evidence did not sustain the defendant's contention that Silver had submitted a form of lease with demand for its execution as a condition to acceptance of same. Plaintiffs prepared and submitted the lease accompanied with specifications made by Silver covering its requirements in the construction of the building.

On February 7, 1929, plaintiffs, from their New York office, wired the defendant to the effect that they had closed with Silver "basis your listing January 17th (naming the rental according to modified contract) Owner to construct building along approved commercial lines to suit tenant's specifications." In a letter of confirmation dated the next day, plaintiffs wrote the defendant (after quoting the telegram) as follows: "Our Mr. Austin, who has been discussing this matter with you is away on his honeymoon at present, but by referring to his file we find that the price contemplated the erection by you of a two story building 50 x 140 feet, along approved commercial lines to suit tenant's specifications. We had also understood that you might possibly carry the building to an additional height. We shall be pleased to have you advise us just how you wish to proceed. We can, of course, have Silver send you a typical building plan, which we will be glad to do in the event you decide to build only the two stories. If, however, you decide to construct a larger building, containing offices above, then the column arrangement and the general lay-out of the Silver

plan might not be adapted to your uses. We shall, therefore, be glad to hear from you further in the premises at once so that the matter can be concluded without further delay.

"Yours very truly,

"F. F. McNeny
"For McNeny & McNeny.

"P.S. Isaac Silver and Bros. Company are rated by R. G. Dun & Company as AA A1, and their last financial statement shows net assets in excess of $5,000,000."

The defendant's letter in reply to the above telegram and letter made no objection that the terms stated therein were not in accordance with the listing contract, but expressed the writer's indecision as to whether he wanted to build "just a two story or more under this contract." He suggested that Silver be directed to send one of his typical building plans for a two-story building, "and if I only go two stories, in all probability we would adopt his plans, which, of course, would be more suitable to his business possibly than if I went several stories above." He asked to be advised as to the location of Silver's headquarters, and class of business they do, how many stores they had, and where located, that he might begin to make some investigation while the brokers were taking up the above outlined proposition with them about the building. Certain other paragraphs of the letter were:

"When I have investigated Isaac Silver & Bros. Company financially, and we have come to the conclusion as to the kind of building I will construct, there is nothing in the way to keep us from going right ahead with this building as the lot is now vacant."

"Of course, if we only build an up to date two story building it will not take us long to build it, but if I build several stories it would take us several months, and I suppose Isaac Silver & Bros. Company would want to get located and their business going as quick as possible."

"When I get Mr. Silver's plans for a two story building, I can determine definitely what kind of a building I am going to build, whether two stories or more, and then you can come out here and we will finally close up the deal and let the contract for construction when we agree on the plans."

When the form of lease prepared by the plaintiffs, together with Silver's specifications incorporated as a part of the plans and specifications for the building, which had been furnished to Silver by the defendant,

was received by the defendant, he wrote plaintiffs as follows:

"I am in receipt of your letter of the 1st and this morning received the plans and contract relative to the proposed building that I was expected to build for Isaac Silver, but this plan he has drawn and the different ideas he has injected into the contract, makes it all a onesided proposition and I could not afford to do all that he has outlined, for the rent he wants to pay.

"In the first place the lot that I proposed to erect the building on I can sell any day for $100,000.00 and the building that Mr. Silver has outlined for me to build, after getting my architect to go over it will cost me about $60,000.00, giving me an income average of $13,000.00 a year income on this investment and he expects me to pay the taxes, insurance and upkeep on this investment, which I did not understand I was to do. This would net me gross about 8.66¾%, figuring that it will take 5% to take care of the insurance, taxes, and upkeep would leave me a net on my investment about 4%, and you can readily see I could not afford to build this kind of a building and furnish him this class of property for no such income, hence I think as far as I am concerned, we had better abandon the idea of making any contract with Mr. Silver.

"If I can't get somewhere around 8% net on my money, I would prefer to buy Vendor Lien Paper, or buy Government Bonds at 4 to 4½% and sell the lots.

"In Mr. Silver's plans it would make it almost impossible for me to build a larger building, say 6 to 10 stories and if I did go do this, I would have to have a battery of 2 to 3 elevators, either in the south side of his building or in the front and this I am sure he would object to, as it would interfere with his show windows and if in the side of the building, it would cut down his front view of the sales room, and if I only build 2 stories at this time, in order that I may build later a taller building, to make the investment a profitable one I would have to build a foundation under a 2 story building, which would at least increase the cost of the building $15,000.00 or more, so the architect here tells me. This would add to my investment outlined above $15,000.00 to $20,000.00, with no income for it; hence it looks to me like it is impossible for me and Mr. Silver to get together on any proposition in the way of building a building for him and I certainly cannot afford to tie my-

self up for 30 years on this kind of a proposition. There must be something more in the way of a profit on my investment than I can figure out I would have. This lot is too valuable to construct a 2 story building on at this expense with so low a net revenue.

"For this reason I think we had better go no further in this deal and drop the matter, as I certainly would not sign the contract as he has it drawn, for the money he has agreed to give as rent.

"Yours truly,

"J. M. Radford."

It will be observed that defendant in this letter did not point out any particular in which he claimed that the specifications of Silver were not according to the terms of defendant's contract with the plaintiffs. It strongly suggests, if it does not compel, the inference that the writer had the impression that he was under no existing contract obligation to do anything; that it was simply a question of whether he would make a proposed investment to be determined wholly upon his judgment as to whether it would be profitable or not; the availability of Silver as a lessee being only one of the factors to be considered. This, it seems to us, was a mistaken conception of the true relation between the parties. Defendant was already bound by certain contractual obligations. He already had notice that the plaintiffs considered they had performed the services which they were employed to perform, and had earned the stipulated commission. In other words, they had procured for him a tenant ready, able, and willing to accept a lease upon the terms and condition specified in their contract of employment by the defendant; he to construct the building as he had agreed in the contract. The contract of employment did not attempt to specify all the provisions of the lease. It only stipulated the rental to be paid and the term of the lease. It is unreasonable to suppose the parties contemplated that the lease should contain no other provisions. It is equally unreasonable to presume that by the omission of other provisions it was contemplated that no valid and binding contract was being made. It is clear enough that the contract of employment contemplated one or more other contracts between the defendant and third parties then unknown. One was the lease contract of a lot and building yet to be constructed thereon. As already said, only two of the provisions of the lease contract were set out. Another contract, or if not another, then at least a distinct sub-ject-matter of the lease contract, involved defendant's obligation to construct a building upon a designated lot. It was deemed necessary to specify more of the terms of that obligation. Accordingly, it was provided that the defendant was to construct upon the 50x140 foot lot, without basement, by an alley, one new store building 50x140 feet with brick walls, flush with the street level; the first and second stories "as to specifications of chain" (which the evidence amply explained to mean specifications of the lessee, who, it was contemplated, would be a chain store owner). The size of the second floor, the columns (as to location and distance between), the location of the elevator, the location of stairway, and the character of front, all were required to be "as specified" (i. e., by the lessee). The kind of heating system was to be gas.

The defendant's obligation to construct the building as to the particulars named, according to the specifications of the lessee, was thus incurred voluntarily. In making the contract, he assented to those provisions the same as all others. Is there any good reason why he should not be bound by those provisions, the same as others, as, for instance, the term of the lease, and the amount of rentals? We do not think so. It was implied that the lessee's specifications would be reasonable, or such as were fairly within the contemplation of the parties at the time of making the contract. There was, we think, sufficient evidence to support the conclusion that defendant, when he employed the plaintiffs to procure a lessee for his property, and at least at the time of the modification of the contract of employment, contemplated the erection of a far more costly building than the lessee required; that the defendant did not refuse to construct the building and execute the lease because the specifications were unreasonable, or not within the contemplation of the parties as provided by the contract of employment, but solely because defendant decided he wanted more money as rental. He was under no binding contract to Silver to construct the building and make the lease, and was, no doubt, within his legal rights in refusing to do so. It does not follow that the plaintiffs had not performed their contract with defendant and were not entitled to the stipulated compensation. Their obligation was only to procure one who was ready, willing, and able to take and comply with a lease upon the terms and conditions specified and not upon others which defendant might thereafter specify.

If the defendant, being the plaintiffs' principal in the negotiations, had good ground for his refusal, he did not state them. "Where the principal has good grounds for refusing to consummate the transaction, but does not specify them at the time of his refusal, he cannot urge them when sued for a commission." 9 C. J. p. 627, § 103. It may be that this principle, to be available, is one required to be presented by a pleading of waiver. But for this question we would be disposed to hold that as a matter of law plaintiffs were entitled to recover. However, because we are inclined to believe that the pleadings were not sufficient upon this point, we pass it over and rest our decision upon other grounds.

The law applicable is stated in 7 Tex. Jur. 450, § 58, as follows: "Where the purchaser is shown to have been ready, able and willing to purchase on the owner's terms, the broker's right to commission is not defeated by the fact that no contract of sale was ever made, or, if made, was not binding on the parties, provided that it is through the fault of the broker's principal that the transaction was not consummated." Hamburger & Dreyling v. Thomas, 103 Tex. 280, 126 S. W. 561. In West Realty & Investment Co. v. Hite (Tex. Com. App.) 283 S. W. 481, it is said: "Generally, it will be conceded that, when a broker employed to sell property has found a purchaser who is ready, able, and willing to buy at the price and upon the terms specified in the broker's contract of employment, he has earned his commission, even though through some fault or inability of the owner the deal is never actually consummated. The rule extends even to those cases where the commission is to be payable only upon the consummation of the sale, if such consummation is prevented through the fault of the owner. The law will not permit the owner to deny to the broker his right to recover a commission where the broker himself has fully complied as far as possible, and where his only dereliction is produced entirely through the fault of the owner himself."

Conceding that defendant may have had some reason for his refusal, the evidence at least raised an issue of fact as to the sufficiency of the reason. "Where an agent employed to sell land complies with the contract of employment, and the owner refuses without sufficient reason to fulfill the agreement the agent has made with the party desiring to purchase, if such party be able, willing, and ready to purchase, the agent has a right to demand compensation." O'Brien v. Gilleland, 79 Tex. 602, 15 S. W. 681, 682; De Cordova v. Bahn, 74 Tex. 645, 12 S. W. 845; Harrell v. Zimpleman, 66 Tex. 293, 17 S. W. 478. If there was evidence tending to show the defendant refused to consummate the deal solely because he was unwilling to do so unless he was paid a larger rental than was agreed upon, his action was arbitrary. In the Missouri case of Mullally v. Greenwood, 127 Mo. 138, 29 S. W. 1001, 1003, 48 Am. St. Rep. 613, the agreement was to pay commissions for negotiating a "satisfactory lease." The facts were somewhat similar to those of the instant case. The court said: "We do not think that the defendants had the right to say, arbitrarily and without cause, that the lease contracted for by plaintiff for them was not satisfactory to them." This conclusion was based upon reasoning as follows: "The court (court below) would not have been justified from the facts and circumstances as disclosed in holding that the plaintiff intended to submit the result of his labors to the caprice of defendants, or any one of them, to approve or reject at will, regardless of any just cause or excuse therefor." For further decisions holding that the rejection may not be made arbitrarily, see Smith v. Stubb (Mo. App.) 293 S. W. 496; Hutton v. Sherrard, 183 Mich. 356, 150 N. W. 135, L. R. A. 1915E, 976. It is not necessary that we give full approval to the decision in those cases in order to warrant our adoption of the court's reasoning as applicable to the instant case. The owner in those cases did, by his contract, reserve the right to be satisfied. Here there is no such reservation of any kind made in the contract.

The last-named fact distinguishes this case, we think, from Joseph v. Bostick (Tex. Com. App.) 276 S. W. 672, relied upon by the defendant. In the last-named case, the owner, by his contract, reserved the right to declare the terms of the lease which the broker was employed to procure. Of course, it was not possible to show that the lessee was ready or willing to lease upon the terms specified in the broker's contract of employment, unless and until the owner had specified what were the terms of the lease. In the instant case, the right of specification in a few particulars, not, however, as to the terms of the lease, but as to the construction of the building, was expressly given to the lessee. Had the lessee failed or refused to make the specifications, the defendant would have been absolved, or, rather, his liability would not have attached. But the lessee did make the specifications. Unless they were unreasonable or

at variance with the contract, which is perhaps the same thing, defendant became liable for the payment of the commissions.

There was evidence which would have warranted the jury in believing that the only reason why defendant refused to construct the building and execute the lease was that he specified a condition contrary to that named in the contract; namely, that the rental should be $1,000 more a year. Where a trade negotiated by a broker falls through because the principal insists on a change in the terms on which he authorizes the broker to negotiate; the commission will be due. 9 C. J. p. 626; Villareal v. Passmore (Tex. Civ. App.) 145 S. W. 1086.

It is therefore our conclusion that the trial court was in error in giving a peremptory instruction for the defendant, for which reason the judgment must be reversed and the cause remanded, which is so ordered.