PEOPLE v GADIENT

Docket No. 115843. Submitted February 21, 1990, at Detroit. Decided
August 23, 1990.

The Recorder's Court for the City of Detroit, Gershwin A. Drain,
J., affirmed a district court magistrate's refusal to bind Sand-
ford I. Gadient, doing business as Huntress Companies, over on
a charge of embezzlement by an agent. The people appealed by
leave granted.

The Court of Appeals *held:*

The trial court did not err in determining that the prosecu-
tion did not make a prima facie showing that the money went
to defendant without the consent of the principal and that
defendant had the specific intent to defraud the principal at the
time of the conversion. Both of these elements are necessary to
a conviction for the charged offense. The magistrate did not
abuse his discretion in refusing to bind the defendant over for
trial on the charged offense.

Affirmed.

1. Criminal Law — Preliminary Examinations — Appeal.

A magistrate may not bind a defendant over for trial on a
charged offense, even though the prosecution has presented
some evidence on each element, if upon an examination of the
whole matter the evidence is insufficient to satisfy the magis-
trate that the offense charged has been committed and that
there is probable cause to believe that the defendant committed
it; the Court of Appeals will reverse such a determination only
if it appears that the magistrate clearly abused his discretion.

2. Embezzlement — Agency.

Two of the elements necessary for a conviction for embezzlement
by an agent are: (1) the agent's act must have been done
without the consent of the principal, and (2) the agent had the

References

Am Jur 2d, Criminal Law §§ 411-413, 418; Embezzlement §§ 9, 10,
19-21, 26.
See the Index to Annotations under Agents and Agency; Embezzle-
ment; Preliminary Hearing; Preliminary or Pretrial Matters.

specific intent to defraud the principal at the time of the conversion (MCL 750.174; MSA 28.371, CJI 27:1:01).

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, and *Theodore S. Klimaszewski,* Assistant Attorney General, for the people.

*Evans & Luptak* (by *Neil H. Fink* and *David A. Koelzer*), for defendant.

Before: REILLY, P.J., and GILLIS and CYNAR, JJ.

PER CURIAM. This is a prosecution of defendant Sandford I. Gadient, a Missouri businessman, for tax evasion and embezzlement of money from Blue Cross and Blue Shield of Michigan in connection with a purchase of real estate in Southfield, Michigan. By leave granted, the people bring this interlocutory appeal from the Detroit Recorder's Court's affirmance of the district court magistrate's refusal to bind defendant over on a charge of embezzlement of $125,000, pursuant to MCL 750.174; MSA 28.371. Defendant was bound over for trial on the tax evasion charges, but those charges are not before us, and the proceedings below have been stayed during the pendency of this appeal. We affirm.

In April of 1984, defendant and BCBSM agreed that BCBSM would hire defendant as an independently contracting management consultant, to assist BCBSM in establishing a real estate subsidiary to manage BCBSM's various properties. In September of that year, defendant located real estate and an office building for BCBSM and the parties made another agreement hiring him to conduct that transaction. The real estate was a partially constructed building in Southfield known as the "Sig-

nature I" project, which BCBSM bought pursuant to defendant's negotiations.

The Signature I project would not, however, have provided BCBSM with enough new office space. Accordingly, defendant immediately negotiated for BCBSM to purchase a neighboring parcel of land, on which another building was contemplated. This project was named Signature II. It is with respect to this second purchase of real estate that defendant is alleged to have embezzled certain monies from BCBSM.

As noted, the relationship between the parties began when BCBSM hired defendant as a management consultant, for which BCBSM paid him $2,000 per diem. When defendant located, negotiated for, and closed on the Signature I building, BCBSM continued to pay him the per diem compensation and, in addition, paid him one percent of the Signature I purchase price, which amounted to $87,500. Additionally, defendant, with BCBSM's knowledge and approval, negotiated with the *seller's* real estate agent for one-third of the agent's Signature I brokerage commission.

The agreement as to Signature II was even more advantageous to defendant. Defendant retained his BCBSM per diem, was paid one percent of the purchase price, and received *half* of the seller's agent's commission. In addition to all that, defendant negotiated directly with the seller for *another ten percent* of the purchase price.

The embezzlement charge at issue centers on defendant's appropriation to himself of the interest earned on the escrow account containing the purchase money for the Signature II project, a sum of $125,000. The substance of this charge may best be understood by focusing on the difference between the escrow arrangements for Signature I and those for Signature II. The purchase money

for Signature I was deposited in escrow pursuant
to an agreement dated October 4, 1984. The key
clause of that agreement relative to our inquiry
provides that the monies to finance the Signature I
deal were to be held in an interest-bearing account
"for seller's benefit."

By contrast, the October 16, 1984, Signature II
escrow agreement provided:

> [A]ll monies subject to this Escrow Agreement
> shall be held in an interest-bearing account and
> Sandford I. Gadient *as agent* for [BCBSM] shall give
> you instructions relative to what interest-bearing
> investments should be made by you. If the transac-
> tions which are the subject of this Escrow close, all
> interest earned up until the time of closing shall
> be credited to *Sandford I. Gadient as agent for*
> [BCBSM]. [Emphasis added.]

From the record of defendant's preliminary
hearing, it appears that this change in the Signa-
ture II agreement from the Signature I agreement
had been negotiated by defendant without the
knowledge of BCBSM. Nevertheless, the record is
also clear that BCBSM did receive a copy of the
Signature II escrow agreement, but apparently
chose not to read it or read it carefully, assuming
it to be identical to the Signature I agreement.

On December 19, 1984, Lewis M. Anderson, vice-
president for BCBSM, signed a letter addressed to
defendant which stated:

> Dear Sandy:
> You are representing Blue Cross and Blue
> Shield of Michigan as a Consultant in connection
> with our real estate operation reorganization
> study, compensation program, and executive
> staffing needs. Additionally, we have asked you to
> serve as a Consultant to represent us (as an "un-
> disclosed principal") in negotiating for the pur-

chase of several major office buildings in the Detroit area, as well as a related office building land parcel, because of your extensive experience and unique abilities in real estate.

While we intend to pay you as a Consultant for the above tasks, *this letter is written to authorize you to negotiate a fee agreement with the Seller of the land in any amount mutually satisfactory between you and them.*

We realize that this places you in the position of receiving compensation from both the Seller (who normally pays the real estate brokerage fee) as well as the Buyer (ourselves, who pay the consulting fees). However, *we would have no objection to you receiving any fee from the land sellers that you may negotiate.*

Thank you again, Sandy, for the helpfulness and assistance you have provided Blue Cross and Blue Shield of Michigan by assisting us in meeting our critical needs. [Emphasis added.]

Then on March 1, 1985, Mr. Anderson, on behalf of BCBSM, sent a follow-up letter to defendant. That letter, which the record indicates had been drafted by defendant, stated:

Dear Sandy:

By way of elaborating on my letter to you of December 19, 1984, we understand you are trying to negotiate some portion or all of your fee due from the Signature property sellers in the form of interest earned in the escrow account at Lawyers Title.

*Since we always planned to pay the gross prices quoted for the properties, and allowed all interest earnings to accrue to the sellers benefit, we have no objection to you receiving some portion or all of any interest earning in the escrow at Lawyers Title.*

Again, while we realize that this places you in the position of receiving compensation from the seller and/or interest earned in the escrow, as well as

from ourselves as buyers, *we have no objection to you earning anything you may negotiate as long as our direct fee paid you is limited to 1% of the $6,100,000 purchase price.*
Thanks, again, Sandy, for all the guidance and assistance you've given us in this transaction. [Emphasis added.]

It was only after having received the above letter that defendant, on March 15, 1985, instructed the title insurance company to remit to him the interest accrued on the Signature II escrow account. The check was issued to defendant in accordance with his instructions on March 18, and the final balance was paid to defendant in August of the same year.

The prosecution contends that defendant misappropriated these interest proceeds, which should have belonged by right to BCBSM, by fraudulently obtaining BCBSM's consent. However, the district court magistrate disagreed, finding that the prosecution had failed to make out a prima facie case of embezzlement against defendant, and the trial court affirmed that decision.

MCL 766.13; MSA 28.931 requires that the magistrate bind over a defendant for trial if it appears after the preliminary examination that a felony has been committed and there is probable cause to believe that defendant committed the crime. As noted by our Supreme Court in *People v King*, 412 Mich 145, 154; 312 NW2d 629 (1981):

> The inquiry is not limited to whether the prosecution has presented evidence on each element of the offense. The magistrate is required to make his determination "after an examination of the whole matter." Although the prosecution has presented some evidence on each element, if upon an examination of the whole matter the evidence is insuffi-

cient to satisfy the magistrate that the offense charged has been committed and that there is probable cause to believe that the defendant committed it, then he should not bind the defendant over on the offense charged.

See also *People v Stafford,* 434 Mich 125, 133; 450 NW2d 559 (1990). This Court will not substitute its judgment for that of the examining magistrate, but will only reverse if it appears that the magistrate clearly abused his discretion. *People v Talley,* 410 Mich 378, 385-388; 301 NW2d 809 (1981).

In this case, the trial court in reviewing the record of the preliminary examination found, inter alia, that the prosecution had failed to make a prima facie showing that the interest monies went to defendant without the consent of BCBSM, and that defendant had the specific intent to defraud BCBSM at the time of the conversion. Both of these elements are necessary to a conviction for embezzlement. CJI 27:1:01. After our own review of the record, we find no error in this assessment of the situation by the trial court.

As noted by the examining magistrate, "[defendant had] the range and the loose ability to wrangle his own fees and at the same time . . . get it from both sides of the street." However artful and shrewd defendant was in his handling of the escrow interest matter, it was done within the wide parameters set for him by BCBSM. BCBSM complains that it was fraudulently deceived by defendant because he authored the pivotal March 1, 1985, letter. But regardless of who drafted the letter, BCBSM endorsed and adopted its contents by signing and issuing it.

The March 1, 1985, letter makes patently clear that BCBSM had no desire to accrue to itself the interest on any escrow monies, nor did it care if

the interest proceeds went to defendant. That letter clearly indicates that BCBSM wished only to obtain the sought after properties at the "gross prices quoted," and to limit its "direct fee" paid to defendant to one percent of the gross purchase price. Beyond that, the letter authorized defendant to obtain for himself "anything [he] may negotiate." While defendant clearly took full advantage of the free rein afforded him by BCBSM, it is also clear that BCBSM received the full benefit of the bargain it sought in these transactions. While the March 1 letter drafted by defendant does omit the fact that the interest on the Signature II deal was to go to BCBSM, there is no disputing that BCBSM had a copy of the Signature II escrow agreement in hand fully five months before the March 1, 1985, letter was issued.

BCBSM gave defendant carte blanche, and he worked it to his best advantage. From the standpoint of proper business practice, the conduct of defendant (or BCBSM for that matter) may not be excusable. However, under the circumstances presented here, we find no basis on which to conclude that the magistrate abused his discretion in refusing to assign criminal intent or criminal liability to defendant's actions. The trial court did not err in affirming the magistrate's determination.

Affirmed.