**BLUE CROSS AND BLUE SHIELD OF MICHIGAN, a nonprofit Michigan health care corporation, and H.C. Real Estate Company, a Michigan corporation, Plaintiffs and Counter–Defendants,**

v.

**HUNTRESS REAL ESTATE EXECUTIVE SEARCH, INC., Defendant,**

and

**Sandford I. Gadient, Defendant and Counter–Plaintiff.**

No. 88–74005.

United States District Court,
E.D. Michigan, S.D.

Dec. 5, 1991.

---

Lisa S. DeMoss, James Karavite, Blue Cross and Blue Shield of Mich., Detroit, Mich., for Blue Cross and Blue Shield of Michigan and H.C. Real Estate Co.

Brian M. Legghio, Cummings & Associates, Roseville, Mich., Neil H. Fink, Evans & Luptak, Detroit, Mich., for Sandford I. Gadient and Huntress Real Estate Executive Search, Inc.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING COUNTER–DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNT II

GADOLA, District Judge.

This case involves an agency relationship between defendant Sandford Gadient and plaintiff Blue Cross and Blue Shield of Michigan ["Blue Cross"]. A five count complaint was filed by plaintiffs October 3, 1988. Defendant Gadient filed his counterclaim December 14, 1988. Defendant Gadient's two count second amended counterclaim was filed May 8, 1991. Plaintiffs filed their motion for summary judgment as to Count II of the counterclaim October 25, 1991. Defendants filed their motion for summary judgment as to plaintiffs' complaint that same day. Plaintiffs' response was filed November 6, 1991. Defendants' response was filed November 7, 1991.

### FACTS

In 1984 Blue Cross realized that its current Detroit office space was severely overcrowded. To alleviate the situation Blue Cross contacted defendant Huntress Real Estate Executive Search, Inc. ["Huntress"] to aid in the management and search for new offices. In a letter dated April 24, 1984, Blue Cross hired Gadient, the president of Huntress, as a management consultant. Compensation for Gadient was to be $2,000.00 *per diem* plus $1,000.00 per visit to Detroit. In August Gadient began aiding in Blue Cross's search for additional office space.

1. Di Maria Dep. at 35–38 (Plaintiffs' Ex. H).

Gadient and Blue Cross entered into an agency agreement whereby Blue Cross would be held as a "hidden principal," thereby assuring that any asking price for office space would not be unduly inflated. Gadient worked primarily with Roy Harrison, Blue Cross's director of building services, Lewis M. Anderson, vice president of Blue Cross, and Donald Puscas, senior executive vice president of Blue Cross. Puscas has been referred to as "the number two man" at Blue Cross. At a meeting with Gadient August 31, 1984, Puscas and Anderson proposed paying Gadient 1% of any purchase price paid by Blue Cross in its acquisition of office space. Gadient asked for 2% from Blue Cross. In lieu of the 2% fee sought by Gadient, Blue Cross authorized Gadient to negotiate for a percentage of the broker's fee with the broker or the seller of any land and building purchased.

On or before September 7, 1984, Gadient approached National Realty Corporation about buying the Signature I project in Southfield, Michigan. Gadient and National Realty then discussed the possibility of splitting the brokerage fee between themselves. National Realty agreed that Gadient could receive one-third of its commission ($133,333.00) of the Signature I sale.

On or before September 20, 1984, Gadient approached National Realty about buying the Signature II project also in Southfield, Michigan. Again, Gadient and National Realty discussed the possibility of splitting the brokerage fee between themselves. National Realty agreed that Gadient could receive between one-third and one-half of its commission on the Signature II sale. These two agreements were made specifically contingent upon Gadient's full disclosure to Blue Cross. Robert Di Maria, vice president of National Realty, had previously stated that he wanted full disclosure of the brokerage fee splits before National Realty would close the sales.[1]

Also, on or before September 20, 1984, Gadient approached the owners of the land surrounding the Signature projects, Robert

Forte and Seymour Mandell, and the owners of the purchase options on the land, Thomas Payne and B. Gerald Bartush [collectively referred to as "Sellers"], about buying the Signature land. Gadient then began discussing a 10% commission if he could get his principal to pay $100,000.00 per acre, or $6,100,000.00. The Sellers and Gadient agreed upon the 10% commission figure. Bartush later stated that first the price was discussed and then the commission. Bartush stated that the commission was not "added on" to the price.[2]

On October 3, 1984, Gadient gave Blue Cross a draft letter memorializing the August 31, 1984 discussions between Gadient, Anderson and Puscas. The draft letter authorized Gadient to receive a portion of the broker's fee from the broker, National Realty Corporation. This draft letter was retyped onto Blue Cross letterhead and signed by Puscas.[3] Again, this letter was necessary for Gadient to receive part of National Realty's commission because Di Maria had made the closings contingent upon full disclosure.

However, Blue Cross was never informed that Gadient and National Realty had already had discussions to split the commissions when this letter was put onto Blue Cross letterhead and signed. Puscas later stated that he never would have signed the October 3, 1984 letter had he known that Gadient and National Realty had already discussed a commission split.[4]

On October 3, 1984, the same day that Gadient received the letter from Puscas, the sale of Signature I closed at a sale price of $8,750,000.00.

Gadient next procured a second letter memorializing the August 31, 1984 discussions between Gadient, Anderson and Puscas. This letter, dated December 19, 1984, and signed by Anderson, authorized Gadient to receive a fee from the Sellers of the Signature land.[5]

On January 9, 1985, the sale of Signature II closed at a sale price of $10,100,000.00.

In March 1985 the land sale finally closed when title was delivered. The land was subsequently assigned to plaintiff H.C. Real Estate Company ["H.C. Real Estate"], a wholly owned subsidiary of Blue Cross.

Gadient received his commission splits from National Realty, his 10% commission from Sellers, his set *per diem* and visit fees, and his 1% fee from Blue Cross.

Blue Cross wished to remain undisclosed beyond the Signature projects purchase dates. Apparently, Blue Cross was con-

---

2. Bartush Dep. at 92–95 (Defendants' Ex. J); *see also* Payne Dep. at 15 (Plaintiffs' Ex. K) ("Hey, if we get our price, I have no problem with that ten percent commission") (quoting Bartush).

3. The October 3, 1984 letter reads in relevant part:

\* \* \* \* \* \*

While we intend to pay you as a Consultant for the above tasks, this letter is written to authorize you to negotiate an agreement with National Realty Corporation, the Broker for the Seller, for a share of National Realty Corporation's real estate commission from the Seller in any amount mutually satisfactory between you and National Realty Corporation.

We realize that this places you in the position of receiving compensation from both the Seller (who pays the real estate brokerage fee) as well as the Buyer (ourselves, who pay the consulting fees). However, we would have no objection to you receiving any part of National Realty Corporation's commission that you may obtain.

\* \* \* \* \* \*

Defendants' Ex. C.

4. Puscas Dep. at 106–110 (Plaintiff's Ex. E).

5. This letter states in relevant part:

\* \* \* \* \* \*

While we intend to pay you as a Consultant for the above tasks, this letter is written to authorize you to negotiate a fee agreement with the Seller of the land in any amount mutually satisfactory between you and them.

We realize that this places you in the position of receiving compensation from both the Seller (who normally pays the real estate brokerage fee) as well as the Buyer (ourselves, who pay the consulting fees). However, we would have no objection to you receiving any fee from the land sellers that you may negotiate.

\* \* \* \* \* \*

Defendants' Ex. D.

cerned that if its identity were made public, the City of Southfield may have held up Signature II's building permit and that the land sale may have been frustrated due to Blue Cross's tax-exempt status. Because of Blue Cross's anonymity, Gadient coordinated B's affairs until the building permit and the land closing were obtained. As compensation for his services, Gadient sought to secure the interest earnings on the escrow accounts held by Lawyers Title, the entity that held Blue Cross's payments to the Sellers while the land title was being secured. On October 16, 1984, Gadient negotiated an agreement with the Sellers to keep for himself the escrow interest earned. On March 1, 1985, Blue Cross issued a letter authorizing Gadient to negotiate for the escrow interest.[6] At the time Anderson signed this March 1, 1985 letter, he claims he did not know about the October 16, 1984 agreement.[7] However, the Michigan Court of Appeals found that Blue Cross had indeed known of the escrow agreement and had indeed had a copy of that agreement.[8]

On September 2, 1987, Blue Cross commenced a special investigation into the Gadient transactions. On November 4, 1987, a Wayne County Citizens Grand Jury was convened to look into possible wrongdoing by Blue Cross executives. Gadient was not a target of this grand jury. This grand jury investigation turned up certain documents relating to the Gadient–Blue Cross transactions. Ultimately, Gadient was indicted on one count of embezzlement.[9] The magistrate dismissed the indictment, and the Recorder's Court affirmed, as did the Michigan Court of Appeals. *People v.*

*Gadient,* 185 Mich.App. 280, 460 N.W.2d 896 (1990).

Plaintiffs' five-count complaint alleges: fraudulent conversion of part of the purchase price, namely the 10% commission Gadient received from Sellers (Count I); fraudulent conversion of interest from escrow account (Count II); breach of agency contract (Count III); refund of fees (Count IV); and accounting (Count V). Defendant's two-count second amended counterclaim alleges: intentional infliction of emotional distress (Count I) and malicious prosecution (Count II).

## STANDARD OF REVIEW

■ Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." (Citation omitted.) *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984) (quoting Black's Law Dictionary 881 (6th ed.1979)). The Court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993,

---

**6.** A letter dated March 1, 1985, and signed by Anderson reads in relevant part:
　　　*　　*　　*　　*　　*　　*

Since we always planned to pay the gross prices quoted for the properties, and allowed all interest earnings to accrue to the sellers benefit, we have no objection to you receiving some portion or all of any interest earning in the escrow at Lawyers Title.

Again, while we realize that this places you in the position of receiving compensation from the seller and/or interest earned in the escrow, as well as from ourselves as buyers, we have no objection to you earning anything

you may negotiate as long as our direct fee paid you is limited to 1% of the $6,100,000 purchase price.
　　*　　*　　*　　*　　*　　*
Defendants' Ex. E.

**7.** Anderson Aff. at paras. 8–10 (Plaintiffs' Ex. F).

**8.** *People v. Gadient,* 185 Mich.App. 280, 283, 460 N.W.2d 896 (1990).

**9.** In a collateral matter, Gadient was indicted on four counts of tax evasion.

994, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir.1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). The initial burden on the movant is not as formidable as some decisions have indicated. The moving party need not produce evidence showing the absence of a genuine issue of material fact; rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg*, 801 F.2d at 861.

To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted); *See Catrett*, 477 U.S. at 322–23, 106 S.Ct. at 2552–54; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed.R.Civ.P. 50(a). *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. Consequently, a nonmovant must do more than raise some doubt as to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact.

## ANALYSIS

Here defendants Gadient and Huntress move for complete summary judgment as to all counts in plaintiffs' complaint, and counter-defendants Blue Cross and H.C. Real Estate move for summary judgment against Count II of counter-plaintiff Gadient's second amended counter-claim. Defendants' motion will be addressed first following each count of the plaintiffs' complaint, and then counter-defendants' motion will be addressed.

### A. FRAUDULENT CONVERSION OF PART OF PURCHASE PRICE

In Count I plaintiffs claim that, because Gadient did not tell Blue Cross that he had already entered into negotiations with the Sellers to secure a commission on the land sale from them, the Blue Cross letter of December 19, 1984, which authorized Gadient to secure a commission from the Sellers, was void. Plaintiffs state that because Gadient did not effect "full disclosure" of the prior negotiations, there was no "full disclosure" as mandated by the Michigan Supreme Court. This argument is tenuous at best.

The Michigan Supreme Court has long held that an agent may represent adverse parties to a transaction as long as both parties know of and consent to the conflict of interest. *Olitkowski v. St. Casimir's Sav. & Loan Ass'n*, 302 Mich. 303, 4 N.W.2d 664 (1942); *Boss v. Tomaras*, 251 Mich. 469, 232 N.W. 229 (1930). The court has stated:

> Where an agent is invested with authority or discretion or has the duty to obtain the best price or terms for his principal it is against public policy for him to represent the other party in the transaction without full disclosure to both of his dual agency.

*Trost v. J.E. St. Clair Co.*, 250 Mich. 342, 345, 230 N.W. 147 (1930).

Gadient asked Blue Cross whether it was acceptable for him to negotiate a commission agreement with the Sellers even though this might put Gadient in a compromising position. Blue Cross assent-

ed to such an agreement in its letter of December 19, 1984. It is hard to imagine why such assent would be withheld if Blue Cross knew of the prior talks. An agreement is an agreement, whether the talks started before or after notice was given to Blue Cross. Because Gadient put his principal on notice that such an agreement would be forthcoming, Gadient has fulfilled his burden of full disclosure. It was then incumbent upon Blue Cross to accept Gadient's dual role or to reject it. Because Blue Cross approved of Gadient's desire to seek the commission, Blue Cross is estopped from disputing Gadient's loyalty.

Further, Michigan law allows for a principal to ratify the acts of its agent. *See, e.g., Bair v. Roosevelt Oil Co.,* 282 Mich. 443, 276 N.W. 510 (1938); *Hutton v. Sherrard,* 183 Mich. 356, 150 N.W. 135 (1914). It appears that this is exactly what Blue Cross has done. By signing such a broad letter, Blue Cross gave Gadient free rein in which to form a commission agreement with the Sellers. Blue Cross cannot now be heard to say that some commission agreements with the Sellers are unacceptable when no limits were placed upon Gadient in the December 19, 1984 letter.

Finally, the argument that the prior negotiations between Gadient and the Sellers somehow harmed plaintiffs might carry some weight if not for the statements of the Sellers themselves. Both Bartush and Payne stated that the 10% commission was discussed *after* the price was finalized. Therefore, the purchase price that Blue Cross paid for the land was not inflated due to Gadient's commission.

### B. FRAUDULENT CONVERSION OF ESCROW ACCOUNT INTEREST

In Count II plaintiffs claim that, because Gadient did not tell Blue Cross that he had already entered into negotiations with the Sellers to secure the escrow account interest, the Blue Cross letter of March 1, 1985, which authorized Gadient to secure the interest from the Sellers' escrow account, was void. Plaintiffs again state that because Gadient did not effect "full disclosure" of the prior negotiations, there

was no "full disclosure" as mandated by the Michigan Supreme Court.

As stated above, Gadient need not inform Blue Cross of any and all prior conversations between himself and the Sellers. Notice to his principal that such an agreement was forthcoming is full and adequate disclosure. Further, the March 1, 1985 letter can be seen as a ratification of the agent's actions, if not specifically then generally. Additionally, the escrow interest did not belong to Blue Cross, did not escalate Blue Cross's purchase price and did not escalate Blue Cross's payments to Gadient. Finally, it was the resulting agreement, not the talks between Sellers and Gadient, that "deprived" plaintiffs of their profits. Such an agreement was assented to by Blue Cross in their March 1, 1985 letter.

### C. BREACH OF AGENCY CONTRACT

In Count III plaintiffs state that Gadient must remit the commission from the Sellers and the escrow interest because he breached his fiduciary duty to Blue Cross and also because the agency contract was breached. As stated above, Gadient did not breach his fiduciary duty. He fulfilled his duty of full disclosure to Blue Cross by notifying it that he desired these very compromising agreements. Gadient further acquired Blue Cross's assent to the compromising agreements. Also, the letter of the agency contract was not breached, as Gadient did secure new office space for his principal without revealing Blue Cross's identity. In essence, Count III is a rehash of Counts I and II.

### D. REFUND OF FEES

In Count IV plaintiffs state that they are entitled to a refund of the *per diem* and visitation fees paid to Gadient because of his alleged breach of duty and contract. Once again, as Gadient has not breached the contract or his duty to Blue Cross, a refund is unwarranted.

### E. ACCOUNTING

In Count V plaintiffs state that an accounting of Gadient's expenses and costs

concerning the transactions should be held due to his alleged breach of duty and contract. Once again, as Gadient has not breached the contract or his duty to Blue Cross, an accounting is unwarranted.

## F. MALICIOUS PROSECUTION

In Michigan, there are six elements that must be proven by the plaintiff in order to prevail in a malicious prosecution suit:

(1) a prosecution instituted or continued by defendant, *Simmons v. Telcom Credit Union*, 177 Mich.App. 636, 638 [442 N.W.2d 739] (1989).

(2) termination of the prosecution in favor of plaintiff, *Kauffman v. Shefman*, 169 Mich.App. 829, 834 [426 N.W.2d 819] (1989); *Young v. Motor City Apts. Ltd.*, 133 Mich.App. 671, 675 [350 N.W.2d 790] (1984),

(3) absence of probable cause for the prosecution of the suit, *Simmons*, 177 Mich.App. at 640 [442 N.W.2d 739]; *Kauffman*, 169 Mich.App. at 834 [426 N.W.2d 819],

(4) malice on the part of defendant, *Kauffman*, 169 Mich.App. at 834 [426 N.W.2d 819]; *Killian v. Fuller*, 162 Mich.App. 210, 214 [412 N.W.2d 698] (1987),

(5) a special injury that flows from the prosecution, *Kauffman*, 169 Mich.App. at 834 [426 N.W.2d 819]; *Young*, 133 Mich.App. at 675 [350 N.W.2d 790], and

(6) plaintiff's suit for malicious prosecution is a "plain case" which should be allowed and not guarded against, *Renda v. International Union, UAW*, 366 Mich. 58, 74 [114 N.W.2d 343] (1962).

First, Blue Cross officials conducted an audit of the Signature transactions and gave that information to the Michigan attorney general's office. Blue Cross officials Anderson, Harrison and Puscas also met with the attorney general and relayed information concerning Gadient and the escrow account interest. Blue Cross officials stated that Gadient had wrongfully procured the escrow interest for himself while insinuating that the interest belonged to Blue Cross. This information led to the embezzlement prosecution of Gadient.

However, this information was false and misleading, as Blue Cross officials knew of the escrow interest arrangement fully three years prior to the investigations. *See Gadient*, 185 Mich.App. at 287, 460 N.W.2d 896.

Michigan recognizes that a private individual who gives false information to a public prosecutor that leads to a prosecution, who does not later correct his or her mistake upon learning the truth and who takes an active role in the prosecution may be held liable for malicious prosecution. *Simmons*, 177 Mich.App. at 639, 442 N.W.2d 739; *see also Renda*, 366 Mich. at 86–87, 114 N.W.2d 343. Blue Cross officials gave prosecutors false information without later correcting themselves after discovering their mistake. Also, Anderson, a Blue Cross official, took an active rather than a passive role in Gadient's prosecution. Anderson's discussions and disclosures were not limited to subpoenaed sessions before the grand jury but included private talks with prosecutors. Therefore, counter-defendants may be held liable for malicious prosecution. For the foregoing reasons, element number one is satisfied.

Second, in the instant case, the criminal prosecution of Gadient has been dismissed on the merits in favor of Gadient. Therefore, element number two has been satisfied.

Third, because the information given to prosecutors by Blue Cross officials was false, there was no probable cause for the prosecution. Therefore, element number three is satisfied.

Fourth, there is an insufficient showing by Blue Cross that malice did not guide counter-defendants' disclosure of false information or failure to disclose the truth. Gadient's bald statements are refuted by counter-defendants' assertions of innocence. There remains a genuine issue of material fact as to element number four.

Fifth, Gadient has pleaded a "substantial injury" which was a proximate result of counter-defendants' alleged malicious prosecution. Because Gadient has not specified the injury, a "special injury" has not been

sufficiently proven. Therefore, there remains a genuine issue of material fact as to element number five.

Finally, the dynamics of this case suggest that this is a case worthy of a malicious prosecution suit. The parties have shown that more than animosity clouds the facts. Blue Cross, as a nonprofit organization, must be beyond reproach in its financial and legal transactions. Because an investigation of Blue Cross was initiated by the State of Michigan, there is ample suspicion that Blue Cross officials may have tried to deflect attention away from themselves and toward Gadient. Therefore, element number six has been satisfied.

## CONCLUSION

Because defendants have met their burden of persuasion, and plaintiffs have not sufficiently refuted the arguments presented, summary judgment will be granted in favor of defendants. Further, as counter-defendants have not met their burden of persuasion, their motion for summary judgment will be denied.

## ORDER

For the foregoing reasons, it is hereby ORDERED that defendants' motion for summary judgment is GRANTED.

It is further ORDERED that counter-defendants' motion for summary judgment on Count II of counter-plaintiff's second amended counterclaim is DENIED.

SO ORDERED.